

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-18-2002

# USA v. Cross

Precedential or Non-Precedential: Precedential

Docket No. 00-3466

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Cross" (2002). *2002 Decisions.* Paper 659.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/659

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 18, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3466

UNITED STATES OF AMERICA

v.

WALTER V. CROSS,
a/k/a
Bobo

      Walter V. Cross,
      Appellant

No. 00-3488

UNITED STATES OF AMERICA

v.

JULES C. MELOGRANE,

      Appellant

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal Action Nos. 94-cr-00233-1/2)
District Judge: Honorable Donetta W. Ambrose

Argued December 6, 2001

Before: ALITO, RENDELL and AMBRO, Circuit Judges

(Opinion filed October 18, 2002)


      R. Damien Schorr, Esquire
       (Argued)
      1015 Irwin Drive
      Pittsburgh, PA 15236

       Attorney for Appellant
      Walter V. Cross

      W. Thomas McGough, Jr., Esquire
      (Argued)
      Efrem Grail, Esquire
      Reed Smith
      435 Sixth Avenue
      Pittsburgh, PA 15219

       Attorney for Appellant

Jules C. Melograne

Linda L. Kelly
United States Attorney
Harry Litman
United States Attorney
Paul J. Brysh (Argued)
Assistant United States Attorney
Office of the United States Attorney
633 U.S. Post Office and Courthouse
Pittsburgh, PA 15219

    Attorneys for Appellee

OPINION OF THE COURT

AMBRO, Circuit Judge:

Jules C. Melograne and Walter V. "Bo" Cross conspired to fix hundreds of cases in the Court of Common Pleas of Allegheny County, Pennsylvania. After a trial in the District Court, a jury convicted them of conspiring to commit mail fraud in violation of 18 U.S.C. SS 371 and 1341,1 and

_____

1. Section 371 (the general conspiracy statute) prohibits conspiring with one or more other persons to commit any offense against or to defraud the United States or one of its agencies, if one of the conspirators does an act in furtherance of the conspiracy. Section 1341 prohibits using the mail to execute or attempt to execute a fraudulent scheme. For simplicity, we use "S 1341" as shorthand for "conspiracy to commit mail fraud."

2

conspiring to violate Pennsylvania citizens' right to a fair and impartial trial in violation of 18 U.S.C. S 241.2 They appealed, and in United States v. Cross, 128 F.3d 145 (3d Cir. 1997) (Cross I), we affirmed theirS 241 convictions but reversed their S 1341 convictions.

In their current appeals, Cross and Melograne argue that their appellate counsel in Cross I was ineffective for failing to argue that United States v. Pelullo, 14 F.3d 881 (3d Cir. 1994), required us to set aside their S 241 convictions on "prejudicial spillover" grounds if we reversed their S 1341 convictions. Without deciding whether their counsel acted reasonably in eschewing the Pelullo argument, we hold that their ineffective assistance of counsel claim fails to satisfy the prejudice prong of Strickland v. Washington , 466 U.S. 668 (1984), because it is not reasonably probable that the Pelullo argument would have succeeded had it been raised.

I. Background

The Allegheny County Court of Common Pleas ("the Court of Common Pleas") is a court of general trial jurisdiction. The Statutory Appeals Division of that Court (the"Statutory Appeals Court") conducts de novo hearings in appeals from

the decisions of the minor judiciary in cases involving summary criminal offenses and motor vehicle and municipal ordinance violations. The minor judiciary is comprised of fifty-five elected district justices as well as appointed magistrates within the City of Pittsburgh. Jules Melograne was a district justice in the Court of Common Pleas. Cross was the supervisor of the Statutory Appeals Court. Cross's duties included determining whether defendants, attorneys, and witnesses (who were generally police officers) were present when a hearing was to begin, managing the order in which hearings were held, handling requests for postponements, and signing pay vouchers for police officers who testified. Nunzio Melograne, Jules's brother, was the "tipstaff " for Judge Raymond Scheib of the Statutory Appeals Court. Nunzio Melograne's duties included serving as an aide to Judge Scheib, keeping the

_____

2. Section 241 proscribes conspiring to injure a person in the exercise of, or because he exercised, a federal right or privilege.

3

Statutory Appeals Court's calendar, maintaining and organizing case files, calling cases, swearing in witnesses, and performing other clerical tasks.

From December 1990 through July 1993, Cross and the Melogranes used "their authority and access to the decision maker"--Judge Scheib--to dictate the results in several hundred Statutory Appeals Court hearings.3  Cross I, 128 F.3d at 146. They fixed cases in various ways. For instance, Cross often produced not-guilty verdicts by asking police officer witnesses to leave court before testifying, or by calling the cases in which they were to testify before they arrived. Id. Often Cross requested during a hearing that Judge Scheib take the case "c.a.v." (curia advisari vult, a Latin phrase meaning colloquially under advisement); Cross and Nunzio Melograne would then meet with the Judge in his chambers after the hearing, and a not-guilty verdict would ensue minutes later. Id. at 146-47. In exchange for fixing cases, Cross and the Melogranes received various gifts and favors from the beneficiaries, such as tickets to Pittsburgh Steelers games, fruit baskets, and jackets.

Although most of the results they engineered were favorable to defendants, Cross and the Melogranes 4 also ensured that many defendants were found guilty. If they desired a guilty verdict in a particular case, they would simply tell the Judge to find the defendant guilty. In one typical example, a defendant was found guilty after Cross instructed the Judge to "find this sucker guilty." Id. at 147. Some clearly innocent defendants were found guilty as a result. For example, Cross and the Melogranes got the Judge to find one defendant guilty even though the

_____

3. As a jury convicted Cross and the Melogranes on both counts, we view the evidence presented at trial in the light most favorable to the

Government. United States v. Scott, 223 F.3d 208, 209 n.1 (3d Cir. 2000); United States v. Davis, 183 F.3d 231, 238 (3d Cir. 1999).

4. Because a participant in a conspiracy is liable for the reasonably foreseeable acts of his coconspirators in furtherance of the conspiracy (e.g., Pinkerton v. United States, 328 U.S. 640, 647 (1946); United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001)), for convenience we will often use "they" or "Cross and the Melogranes" as the subject when referring to acts by Cross or one of the Melogranes in furtherance of the S 241 conspiracy.

4

prosecutor wanted to withdraw the charge, as the evidence did not show a violation. Id.

In November 1994 a federal grand jury in the Western District of Pennsylvania indicted Cross and the Melogranes.5 Count I alleged that the three violated S 1341 by conspiring "to deprive the citizens of Allegheny County of their intangible right to honest services of government employees, furthered by the use of the United States mail."6 The factual allegations underlying Count I--which were divided into three sections--related to Cross and the Melogranes fixing cases both for and against defendants, and mailing notices of the dispositions to the parties. The first section of Count I alleged that they caused 243 cases to be dismissed by starting hearings before police officers arrived to testify or by asking the officers to leave before they testified. The second section alleged that Cross and the Melogranes used their influence over Judge Scheib to cause twenty-eight defendants to be found guilty. The third section alleged that they obtained favorable dispositions for 200 defendants. Count II, which pertained only to the "to be found guilty" cases (the second section of Count I), alleged that Cross and the Melogranes violated S 241 by conspiring to deprive twenty-eight Pennsylvania residents of their right to a fair and impartial trial.7

Before trial, Cross and the Melogranes moved under Federal Rule of Criminal Procedure 14 to sever Counts I and II.8 The District Court denied their motion. It explained

_____

5. According to the FBI's lead investigator and the Assistant United States Attorney who prosecuted the case, the Government did not have enough evidence to indict Judge Scheib.

6. Count I also alleged that the defendants conspired to defraud the Commonwealth by depriving it of fines, but the Government did not object when the District Court submitted the S 1341 count "to the jury as a conspiracy with the single objective of depriving citizens of the honest services of the defendants." Cross I , 128 F.3d at 147 n.1.

7. The indictment also charged Jules Melograne with ten counts of mail fraud. These counts, which are not pertinent here, were severed pursuant to the defendants' pretrial motion and were later dismissed.

8. Rule 14 provides in relevant part that a district court may order

separate trials if it appears that joinder will prejudice a defendant.

5

that because "[t]he criminal acts of one co-conspirator in furtherance of the conspiracy are imputed to all other members of the conspiracy," "the acts of all the alleged conspirators would be admissible even in severed trials." United States v. Cross, Crim. No. 94-233, slip op. at 8 (W.D. Pa. Aug. 3, 1995). Further, it found that "the conduct charged is distinct as to each conspiracy," and that "[w]ith such distinct evidence, the jury will be able to separate the evidence." Id. The Court rejected the defendants' claim that they might want to testify as to Count I, but not Count II, because they "failed to specify what testimony they wish to give on one count or their reasons for not wishing to testify on the other." Id.

The jury trial of Cross and the Melogranes lasted three months. The evidence on both counts was overwhelming. The Government introduced tapes of more than fifty conversations, intercepted by FBI surveillance, in which the conspirators discussed their plans to fix various cases. Each juror heard the tapes and received transcripts of the conversations. In addition, the Government presented testimony by FBI Special Agent John Fiore (who investigated the case-fixing scheme), Suzanne Petrocelly (the courtroom clerk), and Catherine Stowe (the Assistant District Attorney who prosecuted most of the cases in the Statutory Appeals Court). The latter two had cooperated with the FBI's investigation by keeping informal records of the cases that Cross and the Melogranes fixed. Further, the Government introduced a notebook in which Nunzio Melograne recorded most of the cases that the conspirators planned to fix, including twenty-five of the to-be-found-guilty cases. The Government also introduced evidence that Cross put a star, check mark, or "c.a.v." notation next to a case on his trial calendar to designate the result. Cross I, 128 F.3d at 147.

The evidence with respect to the to-be-found-guilty cases was especially powerful. The Government presented either a statement by one of the conspirators or an entry in Nunzio Melograne's notebook to prove each of these counts. Nunzio Melograne's notebook demonstrated that Cross and the Melogranes often got defendants found guilty to please police officers and other friends. For instance, one

6

defendant was found guilty because an entry in the notebook stated: "[G]uilty, hard time, Officer M.A. Scott." Another entry in the notebook lists two case numbers and says that "Officer Smith" wanted the defendants in those cases found guilty. Still another defendant was found guilty after Nunzio Melograne wrote in his notebook: "Hesse, guilty, Jules, Hargrove," and Jules called Nunzio the morning of the hearing and said, "[S]tick it in their rear

ends. They are bastards." On other occasions, Cross and the Melogranes got defendants found guilty because they did not like them or their lawyers. For example, in one to-be-found-guilty case, Cross said to Nunzio Melograne about the defendant's attorney, "Screw him. He's not our friend."

Moreover, Cross and the Melogranes boasted of their ability to get defendants found guilty. The Government played for the jury a conversation with a local police chief, taped by the FBI, in which Jules Melograne promised to make sure that a defendant was found guilty and bragged about his influence (via his brother Nunzio) over Judge Scheib:

> I'll get a'hold [sic] of my brother at home, and uh, if it hasn't gone out yet . . . make sure there was a conviction on that. I, I told the guys, anytime they want a, you know, conviction . . . . I make a phone call down there, and my brother tells the judge, you know. . ..

> . . . .

> But my brother knows all that stuff inside and out, uh, he's the judge's tipstaff. And like I always said, you know, if you wanna--ya know . . . [,] somebody give ya a hard time, some bullshit, yeah, then, uh, you alert my brother down there, baboom, that's it.

The jury convicted Cross and the Melogranes on both counts. On direct appeal, their counsel argued that their S 241 convictions should be reversed because no decided case had specifically held that S 241 prohibits orchestrating guilty verdicts, and that their S 1341 convictions should be reversed because the mailed notifications occurred after the completion of the fraudulent scheme. In Cross I  we unanimously affirmed their S 241 convictions. The evidence introduced at trial showed that "Cross and the Melogranes

agreed to use their best efforts to cause the judge in the 'to be found guilty' cases to consider factors other than the merits of the case and to find against the defendant." 128 F.3d at 148. Because preexisting law made it clear that "people are entitled to fair adjudication of their guilt before an impartial tribunal," Cross and the Melogranes had " 'reasonable warning' " that their conduct hindered the exercise of constitutional rights, and thus were liable under S 241. Id. at 148-50 (quoting United States v. Lanier, 520 U.S. 259, 269 (1997)).

However, we reversed their S 1341 convictions. Because the law required mailing notices of dispositions, and because in each case any deprivation of public employees' honest services was complete before the notice was mailed, the mailings "were not in furtherance of the alleged conspiracy." Id. at 150. We remanded to the District Court for resentencing. Id. at 152.

Cross and the Melogranes filed a petition for rehearing en banc, in which they raised for the first time their Pelullo argument (i.e., that the evidence introduced to prove the S 1341 count was so prejudicial that they are entitled to a new trial on the S 241 count). After we unanimously denied their petition and the Supreme Court denied certiorari, Cross v. United States, 523 U.S. 1076 (1998), they moved in the District Court for a new trial under Pelullo  in lieu of resentencing. The Court denied their motion, finding that they were not prejudiced by any "spillover" evidence because "[m]uch of the evidence offered to prove [the S 1341 count] would have been admissible in a separate trial on [the S 241 count]." United States v. Cross, Crim. No. 94-233, slip op. at 1 (W.D. Pa. June 17, 1998) (mem. order). The Court resentenced Cross and Jules Melograne to twenty-seven months in prison followed by two years of supervised release.9

Cross and the Melogranes appealed, invoking Pelullo. We again affirmed without dissent, refusing to reach the Pelullo issue because they did not raise it on direct appeal. United States v. Cross (Cross II), Nos. 98-3370 & 98-3371, slip op.

_____

9. Nunzio Melograne had become too ill to be resentenced, and died after Cross II (referred to in the paragraph immediately below).

8

at 3 (3d Cir. Mar. 17, 1999) (unpublished table decision). Cross and Jules Melograne obtained new counsel and petitioned under 28 U.S.C. S 2255, alleging that their original counsel was ineffective for failing to raise Pelullo on direct appeal. The District Court denied relief. Upon Cross and Jules Melograne's application, the Court granted certificates of appealability enabling them to appeal its rejection of their ineffective assistance claim. Cross and Jules Melograne timely appealed.10

II. Standard of Review

We review the District Court's decision de novo  because both the performance and prejudice prongs of ineffective assistance of counsel claims present mixed questions of law and fact. Duncan v. Morton, 256 F.3d 189, 200 (3d Cir. 2001).

III. Discussion

A. Ineffective Assistance of Counsel Standard

Due process entitles a criminal defendant to the effective assistance of counsel on his first appeal as of right. Evitts v. Lucey, 469 U.S. 387, 396 (1985).11  The two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984), applies to a defendant's claim that his appellate counsel was ineffective. Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); U.S. v. Mannino, 212 F.3d 835, 840 n.4 (3d Cir. 2000) (citations

omitted).12 First, the defendant"must show that counsel's
representation fell below an objective standard of

_____

10. The District Court had jurisdiction over the prosecution under 18
U.S.C. S 3231 and over Appellants' motion to vacate their sentences
under 28 U.S.C. S 2255. We have jurisdiction to review the order denying
Appellants' motion under 28 U.S.C. SS 1291 and 2253.
11. Evitts involved the Fourteenth Amendment's Due Process Clause,
469 U.S. at 388-89, but the Fifth Amendment's Due Process Clause
guarantees federal-court defendants an identical right to effective
assistance of appellate counsel. E.g., United States v. Baker, 256 F.3d
855, 859-60 & n.2 (9th Cir. 2001).
12. Although Strickland relied on the Sixth Amendment, which "does not
apply to appellate proceedings," Martinez v. Court of Appeal, 528 U.S.
152, 161 (2000), it is well-settled that its framework governs claims of
ineffective assistance of appellate counsel. Smith, 528 U.S. at 285
(stating, in a case decided after Martinez, that Strickland applies to such
claims); Mannino, 212 F.3d at 840 n.4 (same).

reasonableness." Strickland, 466 U.S. at 688. Second, he
must show that there is "a reasonable probability"--"a
probability sufficient to undermine confidence in the
outcome," but less than a preponderance of the evidence--
that his appeal would have prevailed had counsel's
performance satisfied constitutional requirements. Id. at
694-95.

Because failure to satisfy either prong defeats an
ineffective assistance claim, and because it is preferable to
avoid passing judgment on counsel's performance when
possible, see id. at 697-98, we begin with the prejudice
prong. This requires us to determine whether there is a
reasonable probability that we would have set aside Cross
and Melograne's convictions on the S 241 count if their
appellate counsel had invoked Pelullo. Before making this
determination, we examine Pelullo in some detail.

B. Pelullo

In Pelullo, the defendant was convicted on forty-nine of
fifty-four counts of wire fraud, 18 U.S.C. S 1343, and one
count of violating the Racketeer Influenced and Corrupt
Organization Act ("RICO"), 18 U.S.C. S 1962, for using a
publicly held corporation and its affiliates (which he
controlled) to defraud a savings and loan institution and
the shareholders of the corporation's affiliates. Pelullo, 14
F.3d at 885. On his first appeal, we affirmed his wire fraud
conviction on one count ("Count 54"), but reversed his
conviction on the other counts (including the RICO count)
because the District Court erroneously admitted"bank
records and summaries thereof " that did not qualify under
any exception to the hearsay rules. Id. We remanded the
case for retrial.

At the second trial, the District Court held that, under
the doctrine of collateral estoppel, the judgment of

conviction against the defendant on Count 54 established the facts underlying that count. Id. at 889. Further, the Court allowed the Government to introduce evidence of those facts, including testimony by an alleged Mafia underboss who said that he had extensive dealings with the defendant and portrayed the defendant "as an associate of the Mafia family." Id. at 897, 899.

After the defendant was convicted on all counts, he again appealed. Id. at 885. We held that the District Court's collateral estoppel ruling violated the defendant's Sixth Amendment right to a jury trial. Id. at 889-97. Because the collateral estoppel ruling prevented the defendant from contesting the facts underlying Count 54, and because those facts constituted the sole predicate act for the RICO count, we reversed the defendant's RICO conviction. Id. We then considered whether the evidence pertaining to Count 54 had a spillover effect " 'sufficiently prejudicial to call for reversal' " of the defendant's conviction on the forty-eight other wire fraud counts. Id. at 897-98 (quoting United States v. Ivic, 700 F.2d 51, 65 (2d Cir. 1983)). To assess the spillover effect, we considered four factors. Id. at 898.

First, we looked at "whether the charges are intertwined with each other." Id. (citing United States v. Berkery, 889 F.2d 1281, 1285 (3d Cir. 1989)).13 We reasoned that Count 54 was "sufficiently similar to" the forty-eight wire fraud counts "to create substantial confusion on the part of the jury." Id. Not only were they all wire fraud counts, but they also alleged "similar fraud consisting of similar conduct, such as falsification of corporate documents and diversion of corporate funds for personal use," and "described

---

13. In Berkery, the defendant was accused of conspiring to possess and distribute P2P (phenyl-2-propanone, a controlled substance used to produce methamphetamine) and of the substantive offenses of possessing and distributing P2P. Berkery, 889 F.2d at 1282. He claimed entrapment on the conspiracy count. Id. Because the prevailing law required a defendant to admit all elements of the counts as to which he claimed entrapment before he could receive a jury instruction on entrapment, the defendant admitted all elements of the conspiracy count. Id. After he was convicted on both the conspiracy and substantive counts, but before we ruled on his appeal, the Supreme Court held in Mathews v. United States, 485 U.S. 58 (1988), that a defendant is entitled to a jury instruction on entrapment even if he denies one or more elements of the crime. In light of Mathews , we reversed the defendant's conspiracy conviction. Berkery, 889 F.2d at 1285. We also reversed his conviction on the substantive counts because they were "closely intertwined" with the conspiracy count and we could "readily see" that the jury might have used his admission of guilt on the conspiracy count to convict him on the substantive counts. Id. at 1285-86.

similar, if not identical, methods used in the alleged frauds." Id. In addition, the counts were framed in "identical language." Id. The "similarities of the counts" led us to conclude that "the risk of jury confusion is significant." Id.

Second, we examined "whether the evidence for the different counts was sufficiently distinct to support the verdict on other separate counts," explaining that "[i]f the evidence was distinct, it is likely that there was no prejudicial spillover effect." Id. (citing United States v. Brown, 583 F.2d 659, 669 (3d Cir. 1978)). We determined that "the jury may well have been confused because much of the evidence on all counts was similar, e.g. , wire transfer documents, bank records, and corporate documents." Id. Moreover, any confusion was exacerbated by the similarity of the charges and the nearly identical language used to frame them in the indictment. Id.

Third, we ascertained "whether substantially all the evidence introduced to support the invalid conviction would have been admissible to prove other counts, and whether the elimination of the count on which the defendant was invalidly convicted would have significantly changed the strategy of the trial." Id. (citing Ivic, 700 F.2d at 65). We determined that "the evidence the government introduced to reprove Count 54 in the second trial was not admissible to prove the other 48 wire fraud counts," so "elimination of the RICO count would have significantly changed trial strategy." Id. at 899.

Finally, we examined "the charges, the language that the government used, and the evidence introduced during the trial to see whether they [were] 'of the sort to arouse a jury' " or "branded [the defendant] with some terms with 'decidedly pejorative connotation.' " Id. (quoting Ivic, 700 F.2d at 65). Of the four factors, this one most clearly highlighted the damage done by the evidence related to Count 54. Because the District Court allowed the Government to introduce the evidence supporting Count 54, the defendant "was not only branded as a convicted felon and a racketeer by the government, but also portrayed as a person associated with the Mafia." Id.  The Mafia underboss "testified to extensive dealings with" the

12

defendant and to "the friendly relationship between" the defendant and "the alleged boss of the Philadelphia Mafia." Id.

Even worse, while at the defendant's first trial he denied having Mafia ties and testified that he had never even met the underboss, the District Court's collateral estoppel ruling prevented him from contesting the underboss's devastating testimony. He could not cross-examine the underboss or contradict his testimony because "the jury would be charged that any testimony of [the defendant] contradicting [the underboss] was false as a matter of law by reason of

collateral estoppel." Id. We had "little doubt" that the Mafia's reputation influenced the jury, especially since the facts underlying Count 54 were "reproved thoroughly and dramatically," whereas the other retried counts were proved by mundane evidence such as bank records and corporate documents. Id. Thus we ordered a new trial on the forty-eight wire fraud counts. Id. at 900.

As we explain below, Pelullo's four factors devolve into two inquiries: (1) whether the jury heard evidence that would have been inadmissible at a trial limited to the remaining valid count (i.e., "spillover" evidence); and (2) if there was any spillover evidence, whether it was prejudicial (i.e., whether it affected adversely the verdict on the remaining count). Considered conversely, we have the shorthand label "prejudicial spillover."14

As a backdrop, it is crucial to understand when prejudicial spillover may occur. When a defendant is convicted on two counts involving different offenses at a single trial and an appellate court reverses his conviction on one of them, prejudicial spillover can occur only if the evidence introduced to support the reversed count would have been inadmissible at a trial on the remaining count. See United States v. Eufrasio, 935 F.2d 553, 571 (3d Cir.

_____

14. Sometimes courts refer to prejudicial spillover as "retroactive misjoinder." See, e.g., United States v. Aldrich, 169 F.3d 526, 528 (8th Cir. 1999); United States v. Gabriel, 125 F.3d 89, 105 (2d Cir. 1997). We believe that description can be misleading. Even if joinder was proper (as it was in Pelullo, for instance), prejudicial spillover from the evidence supporting a reversed count can require reversing a remaining count.

13

1991) (stating that a defendant was not prejudiced by the denial of his motion to sever RICO from non-RICO counts where "the same evidence" was admissible to prove both sets of counts); United States v. Edwards, 303 F.3d 606, 640 (5th Cir. 2002) (holding that defendants alleging prejudicial spillover from fraud counts dismissed by district court after jury verdict "must show" that"otherwise inadmissible evidence was admitted to prove the invalid fraud claims"); United States v. Aldrich, 169 F.3d 526, 528 (8th Cir. 1999) (examining as a threshold question whether evidence presented on reversed counts was admissible to prove remaining count). If the evidence to prove the overturned count would have been admissible to prove the remaining valid count, the defendant was not prejudiced, and there is no need to consider whether the evidence influenced the outcome. See United States v. Prosperi, 201 F.3d 1335, 1345-46 (11th Cir. 2001) (stating that prejudicial spillover cannot occur where the evidence was admissible to prove the remaining valid count); United States v. Gore, 154 F.3d 34, 49 (2d Cir. 1998) (finding no prejudicial spillover where the ostensible prejudice to the appellant resulted from evidence that was admissible on one of the remaining counts); United States v. Rooney, 37

F.3d 847, 855 (2d Cir. 1994) ("Courts have concluded that where the reversed and remaining counts arise out of similar facts, and the evidence introduced would have been admissible as to both, the defendant has suffered no prejudice.").

In practice, therefore, prejudicial spillover analysis under Pelullo begins by asking whether any of the evidence used to prove the reversed count would have been inadmissible to prove the remaining count (i.e., whether there was any spillover of inadmissible evidence). If the answer is "no," then our analysis ends, as the reversed count cannot have prejudiced the defendant.

But if the answer is "yes," then we must consider whether the verdict on the remaining count was affected adversely by the evidence that would have been inadmissible at a trial limited to that count. See 28 U.S.C. S 2111 ("On the hearing of any appeal . . . the court shall give judgment after an examination of the record without

14

regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); Rooney, 37 F.3d at 856 ("It is only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts, that spillover prejudice is likely to occur.") (emphasis in original). In other words, we must consider, as we do in all contexts involving non-constitutional trial errors, whether the "error" was harmless --whether it is "highly probable" that it did not prejudice the outcome. E.g., United States v. Tyler, 281 F.3d 84, 101 n.26 (3d Cir. 2002); United States v. Mathis, 264 F.3d 321, 342 (3d Cir. 2001); United States v. Helbling , 209 F.3d 226, 241 (3d Cir. 2000); United States v. Gibbs, 190 F.3d 188, 213 n.16 (3d Cir. 1999); United States v. Mastrangelo, 172 F.3d 288, 297 (3d Cir. 1999); United States v. Ellis, 156 F.3d 493, 497 n.5 (3d Cir. 1998).

In Pelullo we subsumed our harmless error analysis into the four factors, each of which examined, in different ways, whether the evidence introduced to prove Count 54 might have affected adversely the jury's verdict on the remaining wire fraud counts. It was obvious (and thus did not require direct discussion) that the evidence pertaining to Count 54, none of which was admissible to prove the remaining counts, see 14 F.3d at 899, had prejudiced the defendant. It was readily apparent that spillover evidence likely confused the jury because it was intertwined with the evidence supporting the remaining counts. It was similarly obvious that the Mafia underboss's testimony probably colored both the defendant's trial strategy and ultimately the jury's verdict on the remaining counts. Accordingly, we

did not explicitly apply harmless error analysis as a sequential step in our analysis. But in cases where the prejudicial spillover effect is not so obvious, our precedents instruct that we do so. See, e.g., United States v. Murray, 103 F.3d 310, 319 (3d Cir. 1997); United States v. Quintero,

38 F.3d 1317, 1331 (3d Cir. 1994); United States v. Grayson, 795 F.2d 278, 290 (3d Cir. 1986).15

To summarize, Pelullo requires us to conduct two distinct, sequential inquiries. First, was there a spillover of evidence from the reversed count that would have been inadmissible at a trial limited to the remaining count? Second, if there was any spillover, is it highly probable that it did not prejudice the jury's verdict on the remaining count, i.e., was the error harmless?16 With this understanding, we now proceed to analyze Appellants' claims.

## C. Is it reasonably probable that the Pelullo argument would have prevailed?

### 1. Rule 404

Appellants contend that the evidence pertaining to the favorable disposition cases in the invalidated S 1341 conviction could not have been introduced for a proper purpose if their trial had been limited to the S 241 count. They insist that this evidence would have been inadmissible character evidence under Federal Rule of Evidence 404(a)17 because it could only have suggested that their fixing cases in defendants' favor made them more likely to have fixed cases against defendants. In the alternative, they claim that this evidence would have been excluded under Federal Rule of Evidence 403 because its prejudicial effect would have substantially outweighed its probative value. Contrary to

---

15. Other circuit courts similarly consider harm to the remaining counts when another count is invalidated. See, e.g. , Prosperi, 201 F.3d at 1346; United States v. Wapnick, 60 F.3d 948, 954 (2d Cir. 1995); Rooney, 37 F.3d at 856.

16. We conduct an analogous inquiry when reviewing the denial of a severance motion, though the appellant bears the burden of proof in that context. See United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991) ("Although a trial judge may have abused her discretion in denying a Rule 14 severance motion, we need reverse a conviction only if the appellant shows specifically that the denial caused trial prejudice.").

17. Rule 404(a) provides, with exceptions not relevant here, that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed. R. Evid. 404(a).

Appellants' arguments, and in sharp contrast to Pelullo, all of the evidence introduced to prove the S 1341 count would have been admissible to prove the S 241 count, though (as we discuss below) much of it would have been excluded as cumulative under Rule 403.

Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but, unless inadmissible under another Rule, is "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[18] The Government argues that we need not apply Rule 404(b) because the evidence relating to the favorable disposition cases was "intrinsic" to a single case-fixing scheme that included the to-be-found-guilty cases.

Rule 404(b) "does not extend to evidence of acts which are 'intrinsic' to the charged offense." Fed. R. Evid. 404(b) advisory committee's note (citing United States v. Williams, 900 F.2d 823 (5th Cir. 1990)). The distinction between intrinsic and extrinsic (i.e., "other acts" or "other crimes") evidence is often fuzzy. One leading treatise calls the distinction "at best one of degree rather than of kind." 1 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual 397 (7th ed. 1998). Unfortunately, as the D.C. Circuit has explained, most circuit courts view evidence as intrinsic if it is "inextricably intertwined" with the charged offense (a definition that elucidates little) or if it "completes the story" of the charged offense (a definition so broad that it renders Rule 404(b) meaningless). United States v. Bowie, 232 F.3d 923, 927-29 (D.C. Cir. 2000); see also id. at 929 (stating that "it cannot be that all evidence tending to prove the crime is part of the crime" because that would make Rule 404(b) "a nullity").

These are some of the pedagogical problems with understanding intrinsic evidence. But what does it mean in

_____

18. Rule 404(b) also requires the Government to give the defendant "reasonable notice" when it plans to introduce evidence of uncharged misconduct, but Appellants do not suggest that this provision is relevant to our analysis.

practice? For our Court, acts are intrinsic when they directly prove the charged conspiracy. See Gibbs , 190 F.3d at 217-18. Thus we need not proceed further in this thicket because it is clear that Appellants' involvement in fixing cases in defendants' favor is not part of the S 241 conspiracy.[19]

Thus, contrary to the Government's contention, Rule 404(b) applies here. Appellants' acts pertaining to the favorable disposition cases do not directly prove their conspiracy to violate Pennsylvania citizens' right to a fair

and impartial hearing in the to-be-found-guilty cases, and thus by any definition are not intrinsic to theS 241 offense. In a trial limited to the S 241 count, Appellants would be charged only with conspiring to engineer guilty verdicts, not with conspiring to fix cases generally. While the evidence pertaining to the favorable disposition cases helps prove Appellants' broader conspiracy to fix cases, it does not directly prove that Appellants conspired to get defendants found guilty. Therefore, we must consider whether the evidence relating to the favorable disposition cases would have been admissible to prove the S 241 count under Rule 404(b).

To satisfy Rule 404(b), evidence of other acts must (1) have a proper evidentiary purpose, (2) be relevant under Rule 402, (3) satisfy Rule 403 (i.e., not be substantially more prejudicial than probative), and (4) be accompanied by a limiting instruction, when requested pursuant to Federal Rule of Evidence 105,20 that instructs the jury not

_____

19. Accordingly, we express no view on whether"other acts" evidence that does not directly prove an element of the charged offense may be "intrinsic" (and thus exempt from Rule 404(b)) if the other acts were "inextricably intertwined" with the events underlying the charge, so that the evidence is necessary for the jury to understand how the offense occurred or to comprehend crucial testimony. See, e.g., United States v. Badru, 97 F.3d 1471, 1474 (D.C. Cir. 1996); United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989); United States v. Richardson, 764 F.2d 1514, 1521-22 (11th Cir. 1985); United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983) (per curiam).

20. Rule 105 provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105.

to use the evidence for an improper purpose.21 See United States v. Butch, 256 F.3d 171, 175 (3d Cir. 2001); United States v. Mastrangelo, 172 F.3d 288, 294-95 (3d Cir. 1999). "Other acts" evidence satisfies the first two requirements if it is "probative of a material issue other than character." Huddleston v. United States, 485 U.S. 681, 685 (1988). In other words, there must be an articulable chain of inferences, " 'no link of which may be the inference that the defendant has the propensity to commit the crime charged,' " connecting the evidence to a material fact. Becker v. Arco Chem. Co., 207 F.3d 176, 191 (3d Cir. 2000) (quoting United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)); see also United States v. Echeverri, 854 F.2d 638, 644 (3d Cir. 1988) (stating that the "chain of logic must include no link involving an inference that a bad person is disposed to do bad acts"). Appellants insist that the only possible relevance to the S 241 count of the evidence relating to the favorable disposition cases was to suggest their inclination to fix cases, an obviously impermissible

purpose under Rule 404(a). We disagree.

In the face of the overwhelming evidence against them, Cross and the Melogranes attempted to shift the blame to Judge Scheib. Their main defenses were (1) that they had no opportunity to dictate how cases were resolved because Judge Scheib decided every case independently, and (2) that they performed their various court-related responsibilities in good faith and did not intend to influence cases' outcomes. The evidence pertaining to the favorable disposition cases eviscerated both of these defenses.

_____

21. In the current context, however, it makes little sense to give significant weight in our analysis of admissibility (as distinct from our harmless error analysis) to the absence of a limiting instruction (even if it had been requested), since the District Court did not know ex ante that the evidence should be analyzed as if Cross and the Melogranes were charged only with violating S 241. Along similar lines, while ordinarily a trial judge should require a party offering "other acts" evidence to articulate clearly the chain of inferences leading from that evidence to a material fact, and should explain on the record why (s)he admitted or excluded that evidence, see Murray , 103 F.3d at 316, the District Court here could not have been expected to do so with respect to evidence that was central to the jointly triedS 1341 count.

19

First, the evidence indicated that, contrary to their protestations at trial, Cross and the Melogranes had an opportunity to control Judge Scheib's decisions. For instance, the evidence that Judge Scheib reached the decisions preordained (or, at the very least, foreshadowed) in Nunzio Melograne's notebook or in the conversations intercepted by the FBI showed that they decided, or influenced Judge Scheib to decide, many cases. Indeed, that Cross and the Melogranes fixed numerous cases in defendants' favor suggested that they could routinely obtain whatever result they desired, and discredited their contention that Judge Scheib was not subject to their influence. Their ability to dictate cases' outcomes showed that they had the opportunity to get defendants found guilty, which aided the Government's allegation that they conspired to do so. Cf. Echeverri, 854 F.2d at 644 (holding that testimony that the defendant traveled to Miami to pick up five kilograms of cocaine, one year before the alleged conspiracy to distribute cocaine began, was admissible under Rule 404(b) because his "access to a source" made him more likely to have "initiated the charged conspiracy").

Second, the evidence showed that Cross and the Melogranes intended to control cases' outcomes, and thus refuted their defense of good faith. "In order to admit evidence under the 'intent' component of Rule 404(b), intent must be an element of the crime charged and the evidence offered must cast light upon the defendant's intent to commit the crime." United States v. Himelwright, 42 F.3d 777, 782 (3d Cir. 1994). To convict Appellants on the S 241 count, the Government had to show that they had a specific

intent to interfere with their victims' right to a fair and impartial hearing. See United States v. Coleman , 811 F.2d 804, 808 (3d Cir. 1987) (stating that S 241 is a specific intent offense).

Cross and the Melogranes hotly disputed that they intended to get defendants found guilty, insisting they participated unwittingly in Judge Scheib's misconduct. Indeed, they spent so much effort straining to convince the jury that they acted in good faith that the prosecutor was forced to emphasize during his closing argument that"[t]he issue in this case is not Judge Scheib's culpability but the

defendants' culpability." In addition, the District Court instructed the jury that "the defendants contend that they acted in good faith," and that they could not be convicted on the S 241 count unless the Government proved "intent to violate civil rights beyond a reasonable doubt," which "would negate the defense of good faith."

The evidence that Cross and the Melogranes fixed cases in defendants' favor refuted their claims of good faith. If they were acting in good faith, they would not have asked police officers to leave before testifying. Nor would they have accepted gifts and favors in exchange for engineering requested outcomes. This evidence relating to the favorable disposition cases showed that, rather than acting in good faith, Cross and the Melogranes intentionally fixed those cases, which suggested that they intended to fix the to-be-found-guilty cases as well. Cf., e.g., United States v. Console, 13 F.3d 641, 658-59 (3d Cir. 1993) (holding that evidence that defendants submitted fraudulent medical bills on other occasions was admissible to show that they knew that the bills at issue in the case were fraudulent and that they intended to defraud insurance companies by submitting them); United States v. Dise, 763 F.2d 586, 592-93 (3d Cir. 1985) (holding that where the defendant, who was charged with physically abusing severely mentally retarded patients in violation of 18 U.S.C. S 242, insisted that he was motivated by safety concerns, evidence that he made the patients ingest cigarette butts and kicked them in the buttocks was admissible to prove his intent to harm them); see also Huddleston, 485 U.S. at 691 (explaining that where defendant charged with selling and possessing stolen videotapes denied knowing the tapes were stolen, evidence that he bought stolen televisions from the person who sold him the videotapes was admissible to show that he knew the tapes were stolen). Similarly, trial evidence showed that Cross and the Melogranes did not inadvertently get defendants found guilty. See  Fed. R. Evid. 404(b) (stating that "other acts" evidence is admissible to show "absence of mistake or accident"); United States v. Vega, 285 F.3d 256, 262 (3d Cir. 2002) (holding that evidence of the defendant's involvement in a prior drug conspiracy was admissible to prove "that he did not unwittingly participate" in the charged conspiracy).

In addition to demonstrating that Cross and the Melogranes had the opportunity and intent to violateS 241 by interfering with Pennsylvania citizens' right to a fair and impartial hearing, the evidence relating to the favorable disposition cases helped explain their motives in getting certain defendants found guilty. The existence of an overarching scheme can provide circumstantial evidence of a defendant's guilt by explaining his motive in committing the alleged offense. See, e.g., J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1268-69 (3d Cir. 1994); Government of the Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d Cir. 1992); 1 John W. Strong et al., McCormick on Evidence S 190, at 661 (5th ed. 1999). This is especially important when the charged offense requires specific intent, see Strong et al., supra, at 665 & n.36, which (as noted) S 241 does, see Coleman , 811 F.2d at 808.

Cross and the Melogranes engineered favorable dispositions for defendants in exchange for various gifts and favors. One of their primary methods of obtaining a favorable disposition was to inform a police officer that he could leave before the case in which he was to testify was called. To ensure the officers' continued cooperation in their scheme, Cross and the Melogranes needed to reward them. As Nunzio Melograne's notebook attests, they got certain defendants found guilty to please police officers with whom they were collaborating. The evidence of the gifts and favors, and of the officers told to leave court before testifying, was important to enable the jury to understand why they wanted to curry favor with the police, and thus was probative of their motive in fixing cases against defendants whom police officers did not like.

In sum, each piece of evidence relating to the favorable disposition cases would have been admissible to prove the S 241 count under Rule 404(b) because each was"probative of a material issue other than character."22 Huddleston, 485

---

22. Jules Melograne contends that he would have testified if charged only with violating S 241, as he would not have had to explain his involvement in the favorable disposition cases. But since the evidence relating to those cases was admissible to prove theS 241 count, this argument is unavailing.

U.S. at 686. To be admitted, however, the evidence needed to satisfy the requirements of Rule 403, to which we now turn.

2. Rule 403

Federal Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." It creates a presumption of admissibility. United States v. Universal Rehabilitation Serv. (PA), Inc., 205 F.3d 657, 664 (3d Cir. 2000) (en banc) (citations omitted). Evidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect "substantially outweigh[s]" its probative value. Fed. R. Evid. 403. As one example, when evidence is highly probative, even a large risk of unfair prejudice may be tolerable.

Appellants insist that the evidence relating to the favorable disposition cases was inflammatory, confusing, and cumulative with respect to the S 241 count, and thus would have been excluded under Rule 403. Specifically, they claim the evidence under S 1341 that they asked police officers to leave without testifying, and that they received gifts and favors for fixing cases, was unfairly prejudicial because it led the jury to want to punish them irrespective of their guilt on the S 241 count. In addition, they argue that the sheer volume of the evidence introduced to prove the S 1341 count created an unacceptable risk of confusing the jury, and that it unduly delayed the trial, wasted time, and was cumulative.

The evidence in the S 1341 phase of the case that Cross and the Melograenes asked police officers to leave before testifying, and that they received gifts and favors for fixing cases, was not substantially more prejudicial than probative.23 Rule 404(b) evidence is especially probative

---

23. Appellants' briefs seem to suggest that evidence threatens "unfair prejudice" if it is merely undesirable from the defendant's perspective.

when the charged offense involves a conspiracy. E.g., United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir.), cert. denied, 531 U.S. 972 (2000); United States v. Manner, 887 F.2d 317, 322 (D.C. Cir. 1989); United States v. Merkt, 794 F.2d 950, 963 (5th Cir. 1986); United States v. Sampol, 636 F.2d 621, 659 n.23 (D.C. Cir. 1980).24 For this reason, the Government has broad latitude to use "other acts" evidence to prove a conspiracy.25 See Mathis, 216 F.3d at 26.

The evidence that Cross and the Melograenes asked police officers to leave prior to testifying, and accepted gifts and favors in exchange for arranging favorable dispositions, was very important because it undercut their main defense--

---

However, such a sweeping definition would include"[a]ny evidence suggesting guilt." United States v. Blyden , 964 F.2d 1375, 1378 (3d Cir. 1992). Instead, "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note. Thus our

"focus must be on unfairness in the sense that the proponent would secure an advantage that results from the likelihood the evidence would persuade by illegitimate means." Blyden, 964 F.2d at 1378 (emphasis added).

24. See also Mathis, 216 F.3d at 26 ("In a conspiracy prosecution, the government is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.' ") (footnote omitted) (quoting United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000)); United States v. Escobar-de Jesus, 187 F.3d 148, 169 (1st Cir. 1999) ("In a conspiracy case, evidence of other bad acts . . . can be admitted to explain the background, formation, and development of the illegal relationship, and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust.") (citations omitted).

25. The Fifth Circuit goes further, reasoning that because "Rule 404(b) evidence is particularly probative where the government has charged conspiracy," and because "[i]n the context of a conspiracy case, the mere entry of a not guilty plea sufficiently raises the issue of intent to justify the admissibility of extrinsic offense evidence," Rule 403 justifies excluding the evidence "[o]nly when the defendant affirmatively takes the issue of intent out of the case." United States v. Gordon, 780 F.2d 1165, 1174 (5th Cir. 1986) (citations omitted).

24

that they acted in good faith. Moreover, this evidence was important to enable the jury to understand their motives in fixing some of the to-be-found-guilty cases to please police officers, whose cooperation was essential to their overall scheme of controlling case outcomes and obtaining a quid pro quo (gifts and favors). This evidence was thus highly probative of their intent and motive.

On the other side of the balance, the evidence that Cross and Melograne instructed police officers to leave before testifying likely angered the jury, as the officers ended up getting paid, at taxpayers' expense, for not testifying. And the evidence that they received various gifts and favors for effecting favorable decisions likely made the jury more inclined to want to punish them. But these potentially prejudicial aspects of the evidence do not render that evidence inadmissible under Rule 403, as they fall far short of substantially outweighing their significant probative value.26 "Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." United States v. Gartmon, 146 F.3d 1015, 1021 (D.C. Cir. 1998). We cannot agree with Appellants' argument that highly probative evidence of their intent and motive would have been kept out under Rule 403 merely because the evidence posed some risk of unfair prejudice.27

26. Indeed, courts have admitted far more prejudicial evidence when its probative value is significant. E.g., United States v. LeMay, 260 F.3d 1018, 1027-29 (9th Cir. 2001) (evidence that the defendant, who was accused of molesting his two young nephews, had previously molested other young relatives under similar circumstances was properly admitted under Rule 403 because it bolstered the victims' credibility and corroborated their testimony); United States v. Gartmon, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (evidence that defendant inserted a gun into his girlfriend's vagina in an attempt to coerce her into continuing to help him commit fraud was correctly admitted under Rule 403 because it demonstrated the defendant's intent and controlling role in the scheme, even though it "may have dramatically injured[his] cause").

27. Jules Melograne argues that because he participated in only two of the to-be-found-guilty cases, the evidence relating to the favorable

We also cannot accept Appellants' contention that the probative value of the evidence relating to the favorable disposition cases was substantially outweighed by the extent to which it confused or misled the jury. The District Court rejected essentially the same argument when it denied the pretrial severance motion. It explained that "the conduct charged is distinct as to each conspiracy regarding the courts affected, the nature of the conduct, and the defendants involved," and that "[t]here is nothing that makes it appear that a reasonable jury will not be able to compartmentalize the evidence against each defendant, despite the large number of overt acts alleged in Count I." Not only was the evidence on both counts straightforward and easy for jurors to "compartmentalize," but the Government's presentation of its case also alleviated whatever slight risk of confusion may have existed. The Government divided its case into four parts, devoting one part to background information about how the Statutory Appeals Court operated and about the roles of Cross and Nunzio Melograne, and the other three to prongs (a), (b), and (c) of the indictment (i.e., two parts to the favorable disposition cases, and one part to the to-be-found-guilty cases). Before each of the parts which corresponded to a prong of the indictment, Special Agent Fiore testified and explained to the jury that the Government was moving on to a new portion of its case. Because the evidence was so neatly segmented, the jury was unlikely to have been confused about which evidence pertained to which count.

Despite all this, although no individual piece of the evidence was substantially more prejudicial than probative with respect to the S 241 count, and although none of it posed a threat of confusing the jury that substantially

---

disposition cases was particularly damaging to him. This argument is a red herring. Conspirators are responsible for their co-conspirators' reasonably foreseeable acts in furtherance of the conspiracy, e.g., Pinkerton, 328 U.S. at 647; Lopez, 271 F.3d at 480, so Jules Melograne is just as responsible for the to-be-found-guilty cases in which he did not participate as for those in which he did. Hence there is no reason why

the evidence relating to the favorable disposition cases was more damaging to him than to his co-conspirators.

outweighed its probative value, much of it would have been excluded as cumulative in a trial limited to theS 241 count. See Fed. R. Evid. 403 (providing that relevant evidence "may be excluded if its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). "Evidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates." United States v. Williams, 81 F.3d 1434, 1443 (7th Cir. 1996). In a trial on theS 241 count, there would have been no reason to admit evidence of every overt act alleged with respect to the S 1341 count. Once sufficient evidence was introduced to inform the jury that Cross and the Melogranes asked police officers to leave before testifying so that cases would be dismissed and that their scheme led to their receiving various gifts and favors, the District Court would not have admitted more evidence on these points. Therefore, although each individual piece of evidence relating to the favorable disposition cases had significant probative value with respect to the to-be-found-guilty cases, much of that evidence would have been excluded as cumulative under Rule 403 in a trial limited to the S 241 count. But whether this requires us to reverse Appellants' S 241 convictions depends on whether it is highly probable that the cumulative evidence did not contribute to the jury's verdict.

3. Harmless error analysis

As with other non-constitutional trial errors, the improper admission of evidence does not require reversing a conviction if it is "highly probable that the error did not contribute to the judgment." United States v. Tyler, 281 F.3d 84, 101 n.26 (3d Cir. 2002). When errors of constitutional magnitude are raised on direct appeal, we "must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). Under the"highly probable" standard, however, "[t]here is no need to disprove

'every reasonable possibility of prejudice.' " United States v. Copple, 24 F.3d 535, 546 (3d Cir. 1994) (quoting United States v. Simon, 995 F.2d 1236, 1244 (3d Cir. 1993)); see also United States v. Mathis, 264 F.3d 321, 342 (3d Cir. 2001), cert. denied, 122 S. Ct. 1211 (2002); United States v. Sokolow, 91 F.3d 396, 407 (3d Cir. 1996); United States v. Grayson, 795 F.2d 278, 290 (3d Cir. 1986). While the

Government bears the burden of showing that the error was harmless, United States v. Adams, 252 F.3d 276, 281 (3d Cir. 2001), we can affirm for any reason supported by the record. Tyler, 281 F.3d at 101 n.26; Mathis, 264 F.3d at 342-43; see also Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000) (en banc); Alexander Hamilton Life Ins. Co. of Am. v. Gov't of Virgin Islands, 757 F.2d 534, 547-48 (3d Cir. 1985).

Even if the cumulative evidence prejudiced Appellants to some extent by distracting the jury or by emphasizing events that could have aroused the jury's passions, we can confidently say that it is "highly probable" that the superfluous evidence made no difference in the ultimate verdict of the jury. The evidence supporting theS 241 count was overwhelming. The Government presented either a statement by one of the conspirators or a "guilty" entry in Nunzio Melograne's notebook to prove each of the to-be-found-guilty cases. Special Agent Fiore testified that the defendants whom the notebook designated to be found "guilty" were in fact found guilty. Assistant District Attorney Stowe and Petrocelly, the courtroom clerk, also testified that Cross and the Melogranes got defendants found guilty. The incriminating evidence that came from Appellants' own mouths--the majority of which was admitted in tape-recorded form--was especially damaging. Indeed, Appellants' statements can only be described as shocking. For instance, in a conversation taped by the FBI, Jules Melograne bragged to a local police chief about how easily he could get defendants found guilty: "I told the guys, anytime they want a, you know, conviction . . . . I make a phone call down there, and my brother tells the judge, you know." He added, "[S]omebody give ya a hard time, some bullshit, yeah, then, uh, you alert my brother down there, baboom, that's it." Similarly incriminating statements by Cross were presented, such as his telling the Judge to "find

28

this sucker guilty" when a particular defendant was to be found guilty, and his responding to one to-be-found-guilty request by saying about the defendant, "[W]e'll burn her ass." Cross I, 128 F.3d at 147.

Because the evidence supporting the S 241 count was so powerful, it is highly unlikely that the cumulative evidence relating to the favorable disposition cases contributed to the judgment. The jury would have gained essentially the same knowledge from hearing testimony about a limited number of such cases as it gained from hearing the more extensive testimony at the trial. Further, we seriously doubt that the cumulative evidence could have affected the outcome in light of the devastating evidence supporting theS 241 count. In contrast to Pelullo, where the testimony regarding the defendant's Mafia ties was admissible only as to the reversed count, the most inflammatory evidence presented at Cross and Melograne's trial was that pertaining to the remaining count, which was proved largely by Appellants' colorfully worded admissions. And unlike the defendant in

Pelullo, Appellants were not collaterally estopped from challenging the evidence to which they now object.

Moreover, as the District Court recognized when it rejected Appellants' severance motion, this is not a case where the "evidence pertaining to each count was not, and probably could not have been, segregated at the trial and in the minds of the jurors." United States v. De Cavalcante, 440 F.2d 1264, 1276 (3d Cir. 1971).28 The evidence on each count was sufficiently straightforward and distinct that the jury was unlikely to have been confused by the evidence relating to the favorable dispositions. In clear contrast to Pelullo, 14 F.3d at 898, where both the reversed and the remaining counts alleged the same offense (wire fraud) and the problem was compounded by the complicated evidence of financial transactions and bank records in that case, Appellants were convicted of two very different offenses.

_____

28. Likewise, the District Court's reasoning in ruling on the severance motion, along with the other factors discussed above with respect to the cumulative evidence, convinces us that it is highly probable that the jury's verdict was not affected by the lack of limiting instructions accompanying the evidence relating to the favorable disposition cases.

Further, the District Court admonished the jury that it was not to convict Cross and the Melogranes on one of the charged offenses merely because it found them guilty of the other, and " 'juries are presumed to follow their instructions.' " Zafiro v. United States , 506 U.S. 534, 541 (1993) (quoting Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

Finally, we cannot accept Appellants' arguments that their respective trial strategies would be significantly different in a trial limited to the S 241 count. Both Cross and Melograne insist that they would have called Judge Scheib as a witness had they not been charged with violating S 1341. They claim that he could have given exculpatory testimony on the to-be-found-guilty cases, but that they did not put him on the stand because of the damaging testimony he would have given on the favorable disposition cases. This argument is not plausible. As the Government points out, Judge Scheib would surely have invoked his Fifth Amendment privilege against self-incrimination. The Government had evidence of Judge Scheib's involvement in fixing cases, but not enough to indict him. It is inconceivable that he would have risked giving the Government the additional evidence it needed.

Conclusion

Under Pelullo, an appellate court's decision to reverse one count requires it to reverse the remaining count(s) only if (1) some of the evidence introduced to support the reversed count would have been inadmissible at a trial on the remaining count(s), and (2) the error is not harmless. While

much of the evidence supporting Cross and Melograne's S 1341 convictions would have been excluded as cumulative in a trial on the S 241 count, it is highly probable that this evidence did not contribute to the jury's finding that they violated S 241 by conspiring to deprive Pennsylvania citizens of their right to a fair and impartial trial. Because the prejudicial spillover, if any, was harmless error, it is not reasonably probable that the Pelullo argument would have prevailed on direct appeal had it been raised. Thus

30

appellate counsel was not constitutionally ineffective, and the District Court's denial of S 2255 relief is affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

31