**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 08-3361, 08-3413, 08-3758, and 08-3759
_____

UNITED STATES OF AMERICA,
Appellant in 08-3758 & 08-3759

v.

TAMIKA RILEY AND SHARPE JAMES

Tamika Riley, Appellant in 08-3361
Sharpe James, Appellant in 08-3413
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-07-cr-00578)
District Judge: Honorable William J. Martini
_____

Argued April 13, 2010

Before: SLOVITER and NYGAARD, <u>Circuit Judges</u>, and
RESTANI,[*] <u>Judge</u>

(Opinion Filed: September 16, 2010)

_____

Gerald Krovatin   *ARGUED*

_____

[*] Honorable Jane A. Restani, Chief Judge of the United
States Court of International Trade, sitting by designation.

Krovatin Klingeman
744 Broad Street
Suite 1903
Newark, NJ 07102

Alan D. Bowman   *ARGUED*
Suite 105
Gateway One
Newark, NJ 07102
        Attorneys for Appellants

Norman Gross   *ARGUED*
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ 08101

Paul J. Fishman
Ralph J. Marra, Jr.
George S. Leone
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
        Attorneys for Appellee

_____

OPINION OF THE COURT
_____

RESTANI, Judge.

Defendant-Appellants and Cross-Appellees ("Appellants") Sharpe James ("James") and Tamika Riley ("Riley") were convicted in the United States District Court for the District of New Jersey of three counts of mail fraud (Counts 1–3) as part of a scheme to convey City-owned property in violation of 18 U.S.C. § 1341 and 2, one count of fraud (Count

4) involving a local government receiving federal funds in connection with the fraudulent sale of City-owned properties in violation of 18 U.S.C. § 666(a)(1)(A) and 2, and one count of conspiracy (Count 5) to defraud the public of James's honest services contrary to 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 371. These five counts are collectively called the "Land Fraud Counts." Additionally, Riley was convicted of three counts of housing assistance mail fraud in violation of 18 U.S.C. § 1341 and 2, and three counts of tax fraud for her failure to report income in violation of 26 U.S.C. § 7206(1). Appellants appeal the Land Fraud Counts. For the following reasons we will reverse the convictions on Count 5 and affirm the convictions on Counts 1–4.

## I.  Factual Background and Procedural History

### A.  Facts

The jury convicted Sharpe James and Tamika Riley of the Land Fraud Counts for engaging in a fraudulent scheme to assist Riley's purchase of City-owned parcels of real property under the South Ward Redevelopment Plan ("SWRP"). Sharpe James was the Mayor of Newark, New Jersey for twenty years between July 1986 and June 2006. James was also a New Jersey State Senator representing the 29th Legislative District from 1999 until 2008. Tamika Riley, who had an intimate relationship with James, was the owner and chief executive officer ("CEO") of Tamika Riley, Inc. ("TRI"), a public relations firm specializing in the entertainment industry.

#### 1.  South Ward Redevelopment Plan

In the aftermath of the 1967 Newark riots, many residents abandoned the city, and the market for properties substantially eroded. During this time, home ownership was extremely low and lenders often would not provide financing to acquire property in Newark. In 1998, in order to address these problems, Newark adopted the SWRP, which was designed to sell parcels of distressed, City-owned real property at low prices to pre-approved developers, without advertisement and public bidding.

In exchange, the purchaser contracted to construct new or renovated housing on those parcels,[1] which would then be sold, occupied, and returned to the City's tax rolls, in order to revitalize the residential real estate market and redevelop Newark.

The New Jersey Department of Economic and Housing Development ("DEHD") managed the SWRP process. Initially, the DEHD conducted a pre-qualification process that screened applicants to ensure they had experience in the construction of residential property and the ability to finance the projects. Once DEHD approved an application, department officials drafted a resolution and the contracts, which were then reviewed by the attorneys in the Newark Corporate Counsel's Office ("Corporate Counsel"),[2] the City Clerks office, and the Municipal Council.[3] After the resolutions were approved by the Municipal Council, the DEHD was responsible for enforcing the contractual provisions to renovate the distressed properties.

The SWRP proved successful and profitable to participants early on. By 2001-2002, the market for Newark real estate surged and applicants for SWRP property flooded the DEHD with requests. This success prompted the Municipal

---

[1] The contracts specifically forbade "speculation in landholding." Supplemental Appendix For the United States ("SA") 611:217; 1456 § 17(a). "Speculation" involved purchasing the real property merely for resale at a higher price, rather than for renovation.

[2] Corporate Counsel reviewed the resolutions and contracts for form and legality.

[3] The city of Newark elects both a Mayor, who is the chief of the city, and a Municipal Council, which serves as the legislature. The Mayor is empowered, subject to Municipal Council approval, to sell real property owned by the City. The Municipal Council, without conducting its own investigation, reviewed and considered the DEHD resolutions to determine whether it would authorize the contracts.

4

Council to pressure the program to accommodate "local entrepreneurs" and minorities with little or no development experience. Thus, the DEHD abandoned the pre-qualification process and no longer required applicants to have development experience so long as an applicant had "the right team" to fulfill the obligations under the contract.

### 2. James's Control Over the SWRP

James was very involved in the SWRP process as were his subordinates. Basil Franklin ("Franklin") served as Chief of Housing Production under the James Administration and reported directly to James's Deputy Mayor who was also the Director of the DEHD. James met frequently with his Deputy Mayor to discuss the availability and allocation of properties under the SWRP.[4] The Deputy Mayor would then direct Franklin to approve the SWRP application of those who had been recommended by James.

During the time period at issue, James and the Municipal Council disagreed as to who had the power to select eligible persons to receive City property under the SWRP. After the Municipal Council prevailed in litigation against the Mayor regarding this issue, James successfully sponsored legislation in 2004, Senate Bill 967, that authorized the Mayor alone to select persons eligible for SWRP property.

### 3. James and Riley's Relationship and Riley's Acquisition of SWRP Properties

In 1999, Riley introduced the Mayor to a Newark-born professional basketball player, Eric Williams ("Williams").

---

[4]In 2005, a friend of James went to James's home and asked him how to acquire property through the SWRP. James revealed detailed knowledge about which parcels were available for sale, who had acquired such properties in the past, and stated that if his friend applied for property he would "take care of" the process. SA 506:37.

5

Williams had recently signed a contract with the Boston Celtics and was interested in investing in his home town of Newark. Shortly after the Williams introduction, James's Deputy Mayor brought Riley and her friend to Franklin's office and told Franklin that James wanted him to "help these ladies acquire some property." SA 229:172. Franklin knew that Riley had no experience as a real estate developer, but at the time Riley applied for property the pre-qualification process had been abandoned.

Both James and Riley contest the duration of their intimate relationship. Nonetheless, James was aware that the City transferred real estate parcels to Riley because in his official capacity as Mayor, James signed each of the contracts transferring the properties to TRI. Riley maintained calendars and daily "agenda" lists containing innumerable notations regarding her communications with James about the status of her acquisitions of City-owned property from 2001 through 2006. James was also copied on a letter "advising" Riley that certain City-owned properties were set aside for acquisition by her company. Further, in April 2000, Riley wrote a letter to James, thanking him for his assistance in helping her to obtain City-owned properties.

Riley acquired City-owned property in three phases. Phase I consisted of four properties and Phase II consisted of three properties. Although the Municipal Council approved the sale of five other Phase III parcels to Riley in 2002, she was unable to close on the properties because James informed Franklin that the City "will not do any more business with Tamika Riley until further notice." SA 235:196. In 2004, Riley resumed her pursuit of the SWRP properties (amended Phase III) and the Municipal Council authorized the sale of four other properties to Riley.

Riley developed only two of all the parcels she purchased under the SWRP. As to those properties that she did not

develop, Riley quickly turned around and sold them for a profit.[5] Riley's access to SWRP property ended in 2006, however, when a new mayoral administration instituted legal proceedings to block the sale of the properties to her.

### B.    The Indictment, Trial, and Sentencing

In July 2007, a federal grand jury sitting in Newark returned a 33-count indictment.  The District Court severed the first twenty counts and the Government submitted a redacted and renumbered indictment (hereinafter, "Indictment").[6]  Counts 1–5 of the Indictment, the Land Fraud Counts, include Counts 1–3, which charged James and Riley with mail fraud as part of the scheme to convey City-owned property to Riley between 2002 and 2005, in violation of 18 U.S.C. §§ 1341 and 2.[7]  Count 4 charged James and Riley with fraud involving a local government receiving federal funds, in connection with the fraudulent sale of City-owned properties to Riley in 2005, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2.  Count 5 charged James and Riley with conspiracy to defraud the public of James's honest services between 1999 and 2006, contrary to 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 371.  Counts 6–9 (collectively, the "Housing Fraud Counts") charged Riley with housing assistance fraud in violation of 18 U.S.C. §§ 1341 and 2.  Finally, Counts 10–13 (collectively, the "Tax Fraud Counts") charged Riley with tax evasion in violation of 26 U.S.C. §  7206(1).

---

[5]For example, Riley paid $18,000 for the Phase II properties and without making any improvements sold them for $80,000 a month later.

[6]The group of severed counts charged James with a scheme to defraud the City of Newark of money and property through the misuse of City of Newark credit cards.

[7]Title 18 U.S.C. § 2 states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2.

Trial began on February 26, 2008. On April 16, 2008, following five weeks of testimony, the jury convicted James and Riley on all five Land Fraud Counts and Riley on Counts 6–13. On July 23, 2008, the District Court denied Appellants' post-trial motions. The District Court sentenced James and Riley to a custodial sentence of twenty-seven months and fifteen-months respectively. James and Riley appealed the Land Fraud convictions and the Government cross-appealed the sentences.[8]

## II. Discussion

This Court has jurisdiction to hear the instant appeal pursuant to 28 U.S.C. § 1291. The appeal is limited to the Land Fraud Counts (Counts 1–5). In light of the recent United States Supreme Court decision in Skilling v. United States, 130 S. Ct. 2896 (2010), Appellants seek a reversal of Count 5, the conspiracy to defraud the public of James's honest services.[9] James also argues that if Count 5 falls, then all the Land Fraud Counts should fall. Although we will reverse Appellants' convictions under Count 5, we do not find that there is spillover prejudice sufficient to taint Counts 1–4. Further, we will affirm the convictions under Counts 1–4 because the District Court did not err when it denied Appellants' post trial motions.[10]

_____

[8]Riley does not appeal her housing assistance fraud or tax fraud convictions.

[9]Skilling was decided after this appeal was argued and was not available to the District Court, but we are bound by it. See United States v. Asher, 854 F.2d 1483, 1487 (3d Cir. 1988); see also Griffith v. Kentucky, 107 S. Ct. 708, 716 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

[10]Initially, the Government sought to cross-appeal the sentences of both Appellants because the District Court allegedly did not apply any adjustment under the honest services guideline. In light of Skilling, however, the Government considers the cross-

8

### A. <u>Skilling v. United States</u> and Appellants' Honest Services Fraud Convictions Under Count 5

#### 1. <u>Skilling v. United States</u>

In June 2010, the United States Supreme Court decided <u>Skilling</u> and addressed the issue of whether the jury properly convicted Skilling of conspiracy to commit honest services wire fraud. <u>Skilling</u>, 130 S. Ct. at 2907. Jeffrey Skilling, a longtime Enron officer, was Enron's chief executive officer from February until August 2001, when he resigned. <u>Id.</u> Less than four months after Skilling resigned from Enron, the company declared bankruptcy. <u>Id.</u> The jury convicted Skilling "with conspiracy to commit securities and wire fraud; in particular, it alleged that Skilling had sought to 'depriv[e] Enron and its shareholders of the intangible right of [his] honest services.'" <u>Id.</u> at 2908.

The Supreme Court considered the scope and constitutionality of the honest services statute and determined that "[t]o preserve the statute without transgressing constitutional limitations," § 1346 criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks." <u>Skilling</u>, 130 S. Ct. at 2928, 2931. The Supreme Court rejected the Government's argument that § 1346 should also encompass "undisclosed self-dealing by a public official . . . [such as] the taking of official action by the [official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." <u>Id.</u> at 2932 (internal quotation marks and citation omitted). Because the Government in <u>Skilling</u> did not allege that Skilling accepted bribes or kickbacks, the Supreme Court determined that Skilling's honest services fraud conviction was flawed and vacated the Fifth Circuit's affirmance of Skilling's conspiracy conviction. <u>Id.</u> at 2934–35.

#### 2. The Effect of <u>Skilling</u> on Appellants'

_____

appeal to be moot.

9

**Honest Services Fraud Convictions
(Count 5)**

Appellants argue that the Indictment and the District Court's jury instructions with regard to honest services fraud are inconsistent with the Supreme Court's decision in Skilling and therefore, the conviction under Count 5, "Conspiracy to Use the U.S. Mail to Defraud the Public of Defendant James's Honest Services," must be dismissed.  Although James and Riley challenged the honest services charge on various bases, they did not argue below that honest services fraud was void for vagueness or should be limited to bribes or kickbacks.[11]  Therefore, the most appropriate standard of review is plain error under Federal Rule of Criminal Procedure 52(b).[12]  United States v. Marcus, 130 S. Ct. 2159, 2164 (2010).  Pursuant to Federal Rule of Criminal Procedure 52(b), an appellate court may recognize a "plain error that affects substantial rights," even if that error was "not brought to the court's attention."  Fed. R. Crim. P. 52(b).  Thus,

> an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; [and] (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the

---

[11]In particular, Appellants argued that the jury instructions to Count 5 were invalid because the District Court required merely a general finding of a violation of a common-law fiduciary relationship between a public servant and the public, rather than requiring a violation of a specific statute prohibiting non-disclosure of a conflict of interest.  In light of Skilling and the disposition of Count 5, we need not address this claim.

[12]While we have applied a plain error standard here, one could view its application here as somewhat harsh, given the defendant's objection to the breadth of the honest services charge, see supra note12, and a Supreme Court opinion that was not easy to predict.

outcome of the district court proceedings."

Marcus, 130 S. Ct. at 2164 (citing Puckett v. United States, 129 S. Ct. 1423, 1429 (2009)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 467 (1997) (quotation marks and citation omitted).

### i.  Plain Error Review

The first inquiry is whether the District Court erred because it failed to charge the jury in accordance with the Supreme Court's limitation of honest services fraud in Skilling. The District Court charged the jury, consistent with the Indictment, that a conviction with respect to Count 5, "Conspiracy to Use the U.S. Mail to Defraud the Public of Defendant James's Honest Services," could be found if James breached one or more of the following three duties of honest services as a public official owed to the State of New Jersey and the City of Newark:

> (i) . . . knowingly committing acts related to his official positions that were unauthorized exercises of his official functions for the purpose of obtaining and receiving money and benefits for himself and others from the governments that he represented, contrary to N.J. Stat. Ann. § 2C:30–2;[13]

---

[13]New Jersey Statute § 2C:30-2 states in pertinent part that,

> [a] public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit . . . [h]e commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner.

11

(ii) as part of his fiduciary duty and his obligation pursuant to the circumstances set forth in Title 18, United States Code, Section 666(a)(1)(A),[14] to refrain from stealing, taking by fraud, misapplying and misappropriating the assets of his public employers; and (iii) as part of his fiduciary duty, to disclose conflicts of interest to his public employers in official matters over which defendant JAMES exercised, and attempted to exercise, official authority and discretion, and to recuse himself where he had such conflicts of interest.

Appendix on Behalf of Appellant Tamika Riley ("RA") 152–53. As an introduction to all three, however, the District Court instructed the jury that honest services fraud does not require a scheme to defraud another to obtain money or property, and could instead be based on a violation of a duty of honest, faithful and disinterested service.[15] The law of this circuit, prior to

_____

N. J. Stat. Ann. § 2C:30-2.

[14]Section 666(a)(1)(A), in its pertinent part, makes any agent of a State or local government who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies . . . property," liable for a federal offense. 18 U.S.C. § 666(a)(1)(A).

[15]The District Court Judge specifically instructed the jury that

[s]ince honest services mail fraud does not require a scheme to defraud another to obtain money or property, I will now instruct you on what a scheme to defraud another of honest services means . . . . [T]he right to honest services is the right that comes from a relationship of trust that one forms with another individual or with an institution. This is known in the law as a fiduciary relationship. [A] fiduciary is prohibited from acting to enrich himself on behalf of the principal. Since the fiduciary acts and speaks for the principal, the fiduciary also owes the principal that he

12

Skilling, did not require a different charge than that given by the District Court Judge here. See United States v. Antico, 275 F.3d 245, 264 (3d Cir. 2001) (holding that honest services fraud constituted a duty "to disclose material information affecting an official's impartial decision-making and to recuse himself . . . regardless of a state or local law codifying a conflict of interest"). In light of Skilling, however, the failure to limit honest services fraud to "bribes and kickbacks," Skilling, 130 S. Ct. at 2928, now constitutes legal error, see United States v. Retos, 25 F.3d 1220, 1229 (3d Cir. 1994) (stating that under Rule 52(b) "[a] deviation from a legal rule is error" (internal quotation marks and citation omitted)).

For the same reason the second inquiry is met. An "error" is plain, clear, or obvious "where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." Retos, 25 F.3d at 1230 (citing United States v. Olano, 113 S. Ct. 1770, 1777 (1993)). In April 2008, at the time of trial, there was no plain error in the honest services fraud charge given by the District Court Judge because it was consistent with the law of this circuit. See Antico, 275 F.3d at 264. The error became clear and obvious, however, when the Supreme Court's decision in Skilling, on June 24, 2010, narrowed honest services fraud to "bribes and kickbacks." Skilling, 130 S. Ct. at 2928. Thus, the error at issue here is a plain error and not "subject to reasonable dispute." Marcus, 130 S. Ct. at 2164 (internal quotation marks and citation omitted).

The third inquiry is whether the district court's plain error affected appellant's substantial rights. As mentioned above, this

serves a duty of frankness and candor in matters that are of material importance to the principal. . . . A public official is a fiduciary for the public and the government he serves . . . [and] owes a duty of honest, faithful and disinterested service to the public and that official's public employer.

SA 1202:59–1203:62.

13

normally occurs where the error "affect[s] the outcome of the district court proceedings." Marcus, 130 S. Ct. at 2164 (quotation marks and citation omitted). The Government concedes that the third alternative description of duty charged to the jury under honest services fraud is now "invalid" in light of Skilling, but argues that James and Riley would have been convicted under either of the other two theories of duty. "[I]f the jury was instructed on alternative theories of guilt and may have relied on an invalid one" it is subject to harmless-error review. Hedgpeth v. Pulido, 129 S. Ct. 530, 530, 532–33 (2008) (per curiam). Thus, we are called upon to perform what is essentially a harmless error inquiry.

### ii. Harmless Error Review

"The test for harmless error is whether it is 'highly probable that the error did not contribute to the judgment.'" United States v. Vosburgh, 602 F.3d 512, 540 (3d Cir. 2010) (citing United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 286 (3d Cir. 1999)). The Government argues, in essence, that the error is harmless because the first two alternative theories of duty under Count 5 remained valid bases for finding a Count 5 conspiracy post-Skilling.

This argument is not persuasive, however, because of the manner in which the now-erroneous description of honest services fraud was interwoven throughout the Count 5 jury charge. The very title of Count 5, "Conspiracy to Use the U.S. Mail to Defraud the Public of Defendant James's Honest Services," invites the application of the District Court's charge to the jury regarding honest services fraud to the entire count. As indicated, the jury instructions for Count 5 began with an over-arching umbrella description of James's fiduciary duty as a public official, which included the now-erroneous honest services definition. Shortly thereafter, the instructions charged that the "Indictment alleges that the Defendant James had the following [three] duties." SA 1203:62. Although the Government argues that these three theories are "alternative" forms of conspiracy liability, and the first two are separate and distinct from James's violation of honest services obligations

14

based on his failure to disclose his conflict of interest, the District Court Judge did not make such a clear distinction in his charge to the jury. Rather, the broad definition of honest services seems to apply to all three duties.

While it is true that the jury convicted James of a substantive violation referred to in one of the alternative descriptions of duty, 18 U.S.C. § 666 (Count 4), we cannot be certain of how the jury utilized the broad definition of an honest services violation given in connection with the entire conspiracy charge. This is particularly true because the charge was described as "Conspiracy to Use the U.S. Mail to Defraud the Public of James Honest Services," and because of the general manner in which the Government argued for conviction on Count 5. Rather, it appears highly probable that the now-erroneous honest services fraud definition contributed to the convictions on Count 5. The plain error, therefore, was not harmless.

Lastly, because all three conditions are met this Court can choose to exercise its discretion only if "the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Cotton, 535 U.S. 625, 631 (2002). "We have held previously that affirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt affect[s] substantial rights, and seriously impugns the fairness, integrity and public reputation of judicial proceedings." United States v. Jones, 471 F.3d 478, 480 (3d Cir. 2006) (quotation marks and citations omitted). It is clear that as far as a conspiracy to commit honest services fraud, as set forth in 18 U.S.C. § 1346, the Government did not prove that fraud occurred by means of bribes or kickback as is now required by Skilling. Appellants focused on the definition of honest services because that was the heart of Count 5. In the context of this case, where the fraudulent act is the non-disclosure of a conflict of interest, it would demean the judicial process to attempt to put the genie back in the bottle by essentially rewriting the charge to the jury on Count 5 and assuming the jury made distinctions the Government did not bring out in its summation.

### 3.      Prejudicial Spillover

James argues that all of his convictions hinged on the honest services doctrine and thus all the Land Fraud Counts must fall with Count 5.  "Generally, invalidation of the convictions under one count does not lead to automatic reversal of the convictions on other counts."  United States v. Pelullo, 14 F.3d 881, 897 (3d Cir. 1994).  Rather, prejudicial spillover analysis requires a finding that "there was a spillover of evidence from the reversed count that would have been inadmissible at a trial limited to the remaining count."  United States v. Cross, 308 F.3d 308, 319 (3d Cir. 2002).  "If the answer is 'no,' then our analysis ends, as the reversed count cannot have prejudiced the defendant."  Id. at 318.  If the answer is "yes," however, "we must ask whether the error was harmless, that is, whether it is highly probable that the error did not prejudice the jury's verdict on the remaining counts."  United States v. Gambone, 314 F.3d 163, 181 (3d Cir. 2003).  Harmlessness is determined by conducting a four-part inquiry into whether,

> (1) the charges are intertwined with each other; (2) the evidence for the remaining counts is sufficiently distinct to support the verdict on th[ose] counts; (3) the elimination of the invalid count significantly changed the strategy of the trial; and (4) the prosecution used language of the sort to arouse the jury.

United States v. Murphy, 323 F.3d 102, 118 (3d Cir. 2003) (quotation marks omitted) (citing Pelullo, 14 F.3d at 898–99).

With respect to the first Cross prong, whether there is now-inadmissible evidence stemming from the reversed count, post-Cross cases have universally analyzed the admissibility of the evidence supporting the fallen count in a hypothetical trial limited to the remaining count.  See e.g., United States v. Lee, 612 F.3d 170, 180 (3d Cir. 2010); United States v. Atiyeh, 402 F.3d 354, 373–74 (3d Cir. 2005); Murphy, 323 F.3d at 118; Gambone, 314 F.3d at 181 (3d Cir. 2003).  Appellants, however, have not pointed to any specific evidence admitted at trial that would now be inadmissible as a result of the reversal of Count 5.

16

Nonetheless, James argues that there is indeed spillover prejudice because of the intertwined nature of the Land Fraud Counts (Counts 1–5) and the pervasive theme of honest services fraud throughout this case. In order to address Appellants' arguments we will assume arguendo that there is some leeway in the application of the Cross threshold inquiry.

Counts 1–3 charged James and Riley with substantive mail fraud as part of the scheme to convey City-owned property to Riley between 2000 and 2006, in violation of 18 U.S.C. § 1341. The federal mail fraud statute states in relevant part that,

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . . any such matter or thing, shall [have committed a federal offense].

18 U.S.C. § 1341. Thus, in order to find a defendant guilty of mail fraud under § 1341, the prosecution must prove that: (1) there was a scheme to defraud; (2) the defendant acted with the intent to defraud; and (3) the defendant used the mails to further or carry out the scheme. United States v. Jimenez, 513 F.3d 62, 81 (3d Cir. 2008) (citing United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002)).

Count 4 charged James and Riley with fraud and misapplication of public property involving a local government receiving federal funds, in connection with the fraudulent sale of City-owned properties to Riley in 2004 and 2005, in violation of 18 U.S.C. § 666(a)(1)(A). Section 666(a)(1)(A), in its pertinent part, states that any agent of a State or local government who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property," is liable

17

for a federal offense.[16]  18 U.S.C. § 666(a)(1)(A).

As discussed above, Count 5 charged James and Riley with "Conspiracy to Use the U.S. Mail to Defraud the Public of Defendant James's Honest Services," contrary to 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 371.[17]  Section 1346 states that "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  In all five of the Land Fraud Counts, fraud, particularly fraud in the form of an undisclosed conflict of interest, was the common thread and the core element of the charge.  The question remains, however, as to whether there is any difference between the fraud charged under §§ 1341 and 666 and the honest services fraud charged under § 1346.  This distinction is best seen through a review of the general history of mail fraud and honest services mail fraud.

Congress enacted the original mail fraud provision in 1872 and proscribed the use of the mails to advance "any scheme or artifice to defraud."  McNally v. United States, 483 U.S. 350, 356 (1987).  In 1909, Congress codified the Supreme Court's decision in Durland v. United States, 161 U.S. 306 (1896), and confirmed that the purpose of the mail fraud statute was to protect property rights.  McNally, 483 U.S. at 357.  The amended

---

[16]Section 666 was "designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program."  United States v. Cicco, 938 F.2d 441, 444 (3d Cir. 1991) (internal quotation marks and citation omitted).

[17]Section 371 states that it is a federal offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy . . . ."  18 U.S.C. § 371.

statute prohibited, as it does today, "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. Subsequent Courts of Appeals decisions emphasized "Congress' disjunctive phrasing . . . [and] interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights." Skilling, 130 S. Ct. at 2926. Thus, the doctrine of honest services fraud was born and the Supreme Court in Skilling attributes its ultimate development to the Fifth Circuit's opinion in Shushnan v. United States, 117 F.2d 110 (1941). Id.

Over the next forty-six years, Courts of Appeals most often applied the theory of honest services fraud to the bribery of public officials. Id. Courts eventually extended the theory to the private sector and "by 1982, all Courts of Appeals had embraced the honest-services theory of fraud." Id. at 2927. In 1987, however, the Supreme Court addressed the constitutionality of the honest-services doctrine and limited the mail fraud statute to the protection of property rights. McNally, 483 U.S. at 359–60. The following year, Congress responded unequivocally and unambiguously. Congress amended the law and reinstated the intangible right to honest services under the Anti-Drug Abuse Act of 1988. Cleveland v. United States, 531 U.S. 12, 19–20 (2000); see 18 U.S.C. § 1346.

Over the next two decades courts were "[a]lert to § 1346's potential breadth" and as a result "the Courts of Appeals [were] divided on how best to interpret the statute." Skilling, 130 S. Ct. at 2928. The Supreme Court noted that although circuit courts have disagreed on several issues, including "whether § 1346 prosecutions must be based on a violation of state law,[18] . . . whether a defendant must contemplate that the victim suffer economic harm, . . . [or] whether the defendant must act in pursuit of private gain," Id. at 2928 n.37, none of the courts "had throw[n] out the statute as

---

[18]This was the focus of Appellants disagreement with the District Court's honest services charge.

irremediably vague." Id. at 2928. Thus, Skilling sought to construe the intent of Congress in its promulgation of § 1346 and held that "§ 1346 criminalizes only the bribe-and-kickback core of the pre-McNally case law." Id. at 2931.

In observing this back and forth between the courts and Congress, it appears that to distinguish between the fraud of §§ 1341 and 666, as opposed to that of § 1346, one must look to the object of the deprivation and not the underlying fraudulent act. The underlying fraudulent act (e.g., the misrepresentation or omission of a material fact) can be exactly the same in all three provisions, as is the case here.[19] Consequently, despite James's contention, the mere fact that Counts 1–3 charge Appellants with a "Scheme to Improperly Favor Close Companion Through Fraudulent Sale of City Properties," does not render the counts automatically invalid under Skilling. Although, as indicated, the underlying fraudulent act in these counts is non-disclosure of a conflict of interest, which makes it seem very near to honest services fraud, what distinguishes Counts 1–3 from honest services fraud is the object of the fraud.

Under § 1341, the deprivation at issue is "money or property." Under § 666(a)(1)(A), the deprivation is also "property." Under § 1346, the deprivation of one's honest services is "biased decision making for personal gain."[20] United

_____

[19]Fraud in and of itself is difficult to construe and "is not capable of precise definition." United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987). We have stated that fraud can be "measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." Id.

[20]Because § 1346 is only applicable to the mail and wire fraud chapter of Title 18, the honest services doctrine does not apply to the "fraud of property" of § 666(a)(1)(A). Section 1346 states, "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

States v. Antico, 275 F.3d 245, 264 (3d Cir. 2001). Nonetheless, the Government need not prove actual loss to the locality to satisfy the elements of the mail fraud statute. United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994). It seems, therefore, that the risk of exposure to such a loss of money or property is sufficient to distinguish §§ 1341 and 666(a)(1)(A) fraud from honest services fraud.[21] See United States v. Asher, 854 F.2d 1483, 1494 (3d Cir. 1988).[22] Here, the District Court

---

"This chapter" refers to Chapter 63, "Mail Fraud and Other Fraud Offenses." Section 666, on the other hand, is in Chapter 31, "Embezzlement and Theft."

[21]With respect to Count 4, intentional misapplication of property under § 666(a)(1)(A), is also a possible basis for conviction, which implicates a risk of loss of tangible property.

[22]In Asher, we illuminated this distinction between what is deprived under mail fraud as opposed to that of honest services fraud. As mentioned above, the Supreme Court in McNally invalidated the honest services doctrine and scaled back § 1341 mail fraud to "fraud of money or property." Before Congress reinstated the honest services doctrine, this circuit and many others were required to distinguish between those cases that were raised pursuant to the recently invalidated honest services doctrine and those that properly fell within the scope of a "scheme to defraud of money or property." See, e.g., Asher, 854 F.2d at 1489–1494. In making this distinction, we determined that,

> Although the outcomes in the post-McNally cases . . . var[ied] depending on the facts, indictments, and jury instructions of the particular case, a common thread running through each of these cases [could] be discerned. While we recognize that cases may fall on either side of the McNally/Carpenter line, those cases that have sustained mail fraud convictions have done so where the "bottom line" of the scheme or artifice had the inevitable result of effecting monetary or property losses to the employer or to the state. This common thread appears despite references in the indictments, proofs, or instructions to violations of intangible

charged that the alleged scheme must contemplate depriving another of money or property. The Government demonstrated that the scheme was to get property into Riley's control when others more qualified than Riley were waiting in line for these properties. Whether or not the City of Newark actually lost money or experienced significant delay in the rehabilitation of the properties involved in Riley's transactions, there was risk of that occurrence because of her lack of experience and privileged position. Neither is likely to encourage optimal performance under the program. In fact, Riley did not perform her contractual obligations. The jury had these facts before it when it considered the Appellants' fraudulent intentions and whether the scheme was to deprive another of money or property. Further, the District Court did not refer to honest services fraud in its jury instruction on mail fraud in the earlier counts. There seems to be little likelihood that the jury used the conflict of interest underlying all of the fraud claims to satisfy the additional elements of the separately charged and argued Counts. Consequently, there is no purpose in further addressing the four-part harmlessness test as we are convinced that this case presents no exception warranting departure from step-one of the <u>Cross</u> analysis. There was no evidence relevant to Count 5 that would not have been admitted with respect to Counts 1–4.

---

rights.

Essentially, therefore, where rights are involved whose violation would lead to no concrete economic harm, and where those rights are the only rights involved in the case, <u>McNally's</u> proscriptions would prevent upholding conviction on appeal. Where, on the other hand, a violation of the rights involved would result in depriving another of something of value, and the indictment, the proofs and the instructions are based on that fact, then the presence of intangible rights language will not prove fatal on appeal.

<u>Asher</u>, 854 F.2d at 1494. This discussion leads to the conclusion that mail fraud under § 1341 requires that the fraud, at the very least, expose the allegedly defrauded party to actual or potential loss of money or property.

## B.     Motion for a Judgment of Acquittal

James and Riley assert that the District Court committed reversible error when it denied their motion for a judgment of acquittal on Counts 1–5.  Because of our disposition as to Count 5,  we will address this allegation with respect to Counts 1–4 only.  "We exercise plenary review over a district court's grant or denial of a motion for acquittal based on the sufficiency of the evidence, applying the same standard as the district court." United States v. Silveus, 542 F.3d 993, 1002 (3d Cir. 2008).

In reviewing the sufficiency of the evidence, "we must view the evidence in the light most favorable to the Government."  United States v. Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978).  This Court affords "deference to a jury's findings . . . [and] draw[s] all reasonable inferences in favor of the jury verdict."  United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996) (internal quotation marks and citation omitted). The jury's verdict will be overturned "only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." United States v. Miller, 527 F.3d 54, 62 (3d Cir. 2008) (quoting United States v. Thayer, 201 F.3d 214, 218–19 (3d Cir. 1999)). Because the reviewing court must treat all of the incriminating evidence as true and credible, "[t]he burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high."  United States v. Lore, 430 F.3d 190, 203–04 (3d Cir. 2005) (citing United States v. Serafini, 233 F.3d 758, 770 (3d Cir. 2000)).

As discussed above, to sustain a conviction of Counts 1–3, mail fraud under § 1341, the prosecution must prove that: (1) there was a scheme to defraud; (2) the defendant acted with the intent to defraud; and (3) the defendant used the mails to further or carry out the scheme.  Jimenez, 513 F.3d at 81 (citing Pharis, 298 F.3d at 234).  Count 4 required the Government to prove the following five elements: (1) James was an agent of the government of the City of Newark; (2) the City of Newark was a local government, that in a one-year period received federal benefits under the federal program involving a grant, contract,

23

subsidy, loan, guarantee, insurance, or other form of Federal assistance in excess of $10,000; (3) James embezzled, stole, obtained by fraud, or otherwise without authority knowingly converted or intentionally misapplied property; (4) such property belonged to, was in the care, custody, or control of the City of Newark; and (5) the value of such property obtained by his conduct was $5000 or more. 18 U.S.C. § 666(a). Aiding and abetting violations of §§ 1341 and 666 was also charged.

### 1. James

James challenges the sufficiency of the evidence with respect to the "scheme to defraud" element of Counts 1–4. Specifically, James argues that the Government did not prove fraud because: (1) the intimate relationship between James and Riley was not proven; (2) James did not "improperly" favor Riley because Riley was not treated any differently than any other prospective developer; (3) James's only "act" with respect to Riley and the properties was ministerial in nature because he merely signed contracts that were previously reviewed by the Corporate Counsel and approved by the Municipal Council; (4) any omission of their alleged relationship was not material because the existence of any relationship between James and Riley would not have disqualified Riley from acquiring property; and (5) James did not receive any benefit because of the non-disclosure. These allegations will be addressed in turn.

First, Riley conceded at trial that they had an intimate relationship. Further, the Government presented evidence that indicates that Appellants went on multi-day vacations to California and the Dominican Republic, and had frequent interactions of both a personal and business nature. For example, James and Riley attended sporting events together, such as the U.S. Open and boxing matches, and appeared at a Broadway performance together in New York City. Additionally, Johnny Jones ("Jones"), James's close political confidant, personally helped Riley obtain a lease to City-owned office space for TRI even though his position in the Newark Government did not normally involve such minor matters. Indeed, when Riley was not satisfied with the renovations of the

office space, she threatened to contact the Mayor regarding the issue. James attended the grand opening of the TRI office and cut the ribbon at the occasion. James also directed his security detail, while on duty, to use his credit card, purchase, and install an air conditioner in the bedroom of Riley's apartment. A member of this same security detail testified that on one occasion James, upon hearing that Riley called, stated he did not want to talk to Riley because she was "dating someone." In light of this evidence presented by the Government, a reasonable jury could have found sufficient evidence to support a finding of an intimate relationship between James and Riley.

Second, James argues that he did not "improperly" favor Riley because Riley was not treated any differently than any other prospective developer. The facts, taken in a light most favorable to the Government, indicate that Riley had a "twenty-four direct connect" to James, and that James was Riley's "'hook' in the City." This relationship resulted in Riley's access to City-owned properties that were otherwise unavailable to most people without development experience. Prospective buyers were supposed to have personal experience in the construction of residential property and the ability to obtain financing for the projects. After the pre-qualification process was abandoned, the applicant was supposed to be surrounded by the right "team" of people who had the experience or financial capacity to deliver what was required under the SWRP. The evidence suggests that Riley had none of the above. Franklin knew that Riley had no experience as a real estate developer and would not have qualified to acquire SWRP properties as the program was initially operated. Further, Riley did not find a developer for the properties until after she was awarded the contracts for the Phase I properties, and thus did not otherwise have a "team" surrounding her when she received the first properties.

Despite this fact, James's Deputy Mayor and Director of DEHD, Alfred Faiella ("Faiella"), brought Riley and her friend to Franklin's office and told him that James wanted Franklin to

25

"help these ladies acquire some property."[23]  Riley subsequently received a list of City-owned property available for purchase and in April 2000, Riley sent a letter to James thanking him for "opening doors" and helping her acquire City-owned properties.

The Government also presented two witnesses who were experienced real estate developers in the Newark area, and were unable to obtain approval for City-owned property.  In the case of Wendee Bailey ("Bailey"), because she was unable to obtain City property, she began by renovating, financing, and finding buyers for two of Riley's Phase I properties.  In the end, however, Riley sold Bailey the subsequent properties outright without undertaking any renovations of her own.  In one instance, Bailey purchased three properties from Riley for $80,000—properties for which Riley paid a total of $18,000.  Consequently, the jury could have reasonably inferred that James treated Riley differently from other developers and improperly favored her.

Third, James argues that his only "act" with respect to the properties was purely ministerial because he merely signed contracts that were previously reviewed by the Corporate Counsel and approved by the Municipal Council.  The evidence presented, however, allows for a different conclusion regarding James's control over the SWRP process.  The SWRP was considered James' "baby."  James met frequently with his Deputy Mayor Faiella, who was also Director of the DEHD, and Faiella occasionally told Franklin that James wanted certain persons to receive particular parcels of SWRP property.

In at least one instance, when Franklin did not follow up on the request by someone "sent" by James, James called Franklin personally and directed him to meet with the applicant

---

[23]James contests the admissibility of this statement.  As discussed below, however, the District Court did not abuse its discretion when it admitted the alleged hearsay statement.  See infra Part II.E.

26

again.[24]   James also demonstrated his control over the SWRP process by informing friends as to how they could acquire property through the SWRP and indicating he would "take care of" their application.  In the case of Prentis Thompson ("Thompson"), James showed Thompson a stack of paperwork regarding applications for SWRP properties that James kept in his home.  James revealed detailed knowledge about which parcels were available for sale and who had acquired such properties in the past and represented that he was "in charge" of the process.

Further, James insured his ability to select eligible people for SWRP properties through his position as a New Jersey State Senator.  James and the Municipal Council disagreed as to who had the power to select eligible persons to receive City property under the SWRP.  After the Municipal Council prevailed in litigation against the Mayor regarding the issue, James successfully sponsored legislation in 2004, Senate Bill 967, that authorized the Mayor alone to exercise that power.

James was well aware that the City was transferring real estate parcels to Riley.  In his official capacity as Mayor, James signed each of the contracts transferring the properties to TRI.  Riley maintained calendars and daily "agenda" lists containing innumerable notations regarding her communications with James about the status of her acquisitions of City-owned property from 2001 through 2006.  James was also copied on a letter "advising" Riley that certain City-owned properties were being set aside for acquisition by her company.

Additionally, James was able to stop and start the disposition of properties to Riley.  In September 2002, Riley sent

---

[24]James called Franklin and told him to meet James at a furniture store in Newark, but Jackie Mattison ("Mattison"), James's former Chief of Staff, met Franklin there in his stead. Mattison told Franklin that he wanted to acquire some property and when Franklin failed to follow-up on Mattison's request, James called Franklin and directed him to meet with Mattison again.

Franklin a proposal for the purchase of the initial Phase III properties, which was approved by the DEHD and the Municipal Council. After the contracts were signed, but before Riley was able to close on the Phase III properties, James informed Franklin that the City "will not do any more business with Tamika Riley until further notice," and Riley never acquired those properties. In 2004, however, Riley resumed her pursuit of SWRP properties and the Municipal Council authorized the sale of four other properties to Riley. Consequently, the jury could have reasonably concluded that James's relationship to the SWRP was not purely ministerial.

James also argues that any control he may have exercised over the SWRP process was "cured" by the review of each contract conducted by the Newark Corporate Counsel, the City Clerk's office and the Municipal Council. A reasonable jury could have concluded otherwise, however, because James does not contest that he did not disclose his relationship with Riley. As established above, there is sufficient evidence for a jury to have concluded that Appellants had an intimate relationship. The SWRP contracts for properties expressly prohibited an official of Newark to "have any personal interest, direct or indirect, in the Contract." SA 1530. The Government presented two witnesses, Joanne Watson ("Watson"), former head of Newark's Corporate Counsel's office, and Augusto Amador, a Municipal Council member during the time at issue, who stated that Appellants' relationship would have been material to their decision to approve the contracts. Thus, the evidence taken in a light most favorable to the Government suggests that review of the contracts by other City government entities could not have "cured" James's control over the SWRP process because they did not possess the information necessary to properly assess the legitimacy of the contracts.

Fourth, James argues that any omission of their alleged relationship was not material because the existence of any relationship between James and Riley would not have disqualified Riley from acquiring property. A misrepresentation or omission is material when it has a "natural tendency to influence, or [is] capable of influencing, the decision of the

28

decisionmaking body to which it was addressed." United States v. Wells, 519 U.S. 482, 489 (1997) (quoting Kungys v. United States, 485 U.S. 759, 770 (1988)).  As discussed above, the Government presented two witnesses who approved Riley's contracts—a Municipal Council member and the former head of the Newark Corporate Counsel's Office—and both stated that they would have regarded Riley's intimate relationship with James as material to the decision to approve the property transaction.  Watson stated that even if the relationship had been terminated at the time James signed the contracts it would have been material to the Corporate Counsel's decision and thus should have been disclosed.  Consequently, a reasonable jury could have found James' omission of his intimate relationship with Riley was material and thus, even if the relationship would not have per se barred Riley from acquiring property, it should have been disclosed.

Fifth, James argues that there can be no extension of criminal liability for a fraud where the defendant did not receive any cognizable benefit because of the non-disclosure.  To support a fraud conviction it is "not necessary for the Government to demonstrate that [the defendant] personally benefitted from [the] scheme."  United States v. Goldblatt, 813 F.2d at 624.  Even if a benefit to the defendant was required, however, a reasonable jury could have concluded that James benefitted through his personal relationship with Riley.  By providing a means for Riley to gain income from the City's assets, James was otherwise relieved from expending his own.  Thus, a reasonable jury could have concluded that James did receive a cognizable benefit even though he did not accept directly any of the proceeds from Riley's sale of the properties.

### 2. Riley

Lastly, Riley argues that she did not have the requisite intent to commit § 1341 mail fraud (Counts 1–3) and that the evidence only supported a conclusion that Riley intended to comply with her contractual obligations as she understood them with the advice of counsel.  In light of the evidence, however, a reasonable jury could conclude that Riley had the requisite intent

29

to defraud. The SWRP contract specifically states that "[t]he Redeveloper represents and agrees that its purchase of the Property, and its other undertakings pursuant to the Contract, are, and will be used, for the purpose of redevelopment of the Property and not for speculation in land holding." SA 1456 ¶ 17(a). Riley developed two of the four properties from Phase I in accordance with her obligations under the contract. Riley submitted pictures of the two redeveloped parcels to support her application for the Phase II properties, but omitted mention of the two Phase I properties she sold without renovation. Riley sold the Phase II properties without making any improvements. Again, with respect to the Phase III properties, Riley asserted that she planned to redevelop the properties and that she had renovated the properties from Phases I and II. Riley again sold the Phase III properties without undertaking any improvements to the properties. Juries may infer intent from circumstantial evidence. See United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994) (stating that in determining sufficiency of the evidence "pieces of evidence must be viewed not in isolation but in conjunction . . . and the jury's verdict may be based on circumstantial evidence" (internal quotation marks and citations omitted)). Thus, a reasonable jury could have concluded that Riley's intent to defraud was demonstrated by her promises to renovate the SWRP properties and her failure to fulfill those commitments for all but two of the properties she received.

Further, for similar reasons, Riley's intent to defraud is not abated by any alleged reliance on her lawyers. Riley's former attorneys testified that they did not "advise her" that her activities violated her contractual obligations. If Riley had discussed the legality of her schemes with her lawyers, and they advised her that her actions were legal, such evidence might have refuted her intent to defraud the City of Newark. See United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) (stating in the context of securities law that "conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent"). The testimony indicates, however, that Riley employed the attorneys primarily to help her sell the properties and neither provided counsel regarding her

obligations under the SWRP.  What the evidence does show, as mentioned above, is that the SWRP applications and contracts were clear that Riley had an obligation to renovate the properties.  Riley demonstrated her understanding of this obligation by her misrepresentation to the Municipal Council that she renovated the properties she sold and her promises to undertake such renovations with respect to future properties.  Thus, a reasonable jury could have determined that the evidence was sufficient to demonstrate Riley's intent to defraud the City of Newark even if her lawyers did not advise her of the nature of her acts.

In conclusion, a review of the evidence presented at trial leads us to conclude that a rational jury could have found that James defrauded the City of Newark and Riley had the requisite intent to defraud the City.[25]  The District Court did not err when it denied a motion for judgment of acquittal based on the insufficiency of the evidence.  In proper deference to the jury's verdict, the convictions for Counts 1–4 will be affirmed.

### C.  Joinder and Lack of Severance of Riley's Tax Offense Counts

We review de novo whether joinder is proper under Federal Rule of Criminal Procedure 8(b).  See Jimenez, 513 F.3d at 82.  We review a district court's denial of a motion to sever under Federal Rule of Criminal Procedure 14 for abuse of

---

[25]The Government argues that to convict James on Count 4, the jury was not required to find that he acted with the intent to defraud or participated in a scheme to defraud.  Rather, the conviction could have been based on a finding that James "misapplied" City property.  The Government argues that the evidence proved that James misapplied the SWRP properties by causing them to be transferred to Riley, not for the authorized purpose of renovation, but so she could improperly receive the proceeds of flipping the properties, an unauthorized purpose.  Because we find sufficient evidence for the jury to have convicted James on the basis of fraud we need not address this argument.

discretion.  See Lore, 430 F.3d at 205.

### 1.    Joinder of the Land Fraud Counts and the Tax Fraud Counts

James asserts that the District Court erred in joining the Land Fraud Counts (Counts 1–5), in which both James and Riley are implicated, with Riley's Tax Fraud Counts (Counts 10–13) under Federal Rule of Criminal Procedure 8(b).[26]  Rule 8(b) states:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).  Under Rule 8(b) there must be a "transactional nexus" between the defendants for the counts to be properly joined.  See Jimenez, 513 F.3d at 82–83. Additionally,  there is a strong preference to try defendants named in a single indictment together in order to "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."  Id. at 82 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).

James argues that Riley's tax offenses were completely separate from the fraud counts and thus were not within the purview of Rule 8(b).  Despite James's contention,  "[j]oinder of tax and non-tax claims is not unusual."  United States v. McGill,

---

[26]We note that on appeal James asserts only that he was prejudiced by joinder of Riley's Tax Fraud Counts (Counts 10–13) and not Riley's Housing Fraud Counts (Counts 6–9).  Thus, we will addresses the issue of joinder of Riley's Tax Fraud Counts (Counts 10–13) only.

964 F.2d 222, 241 (3d Cir. 1992). "It is appropriate to combine tax charges against one defendant with fraud charges against that same defendant and other codefendants if the tax evasion charges arise directly out of the common illicit enterprise." United States v. Bibby, 752 F.2d 1116, 1121 (6th Cir. 1985).

In this case, it was Riley's failure to report income earned from the land fraud scheme that led to her Tax Fraud Counts. Because the tax evasion arose directly from the land fraud proceeds, it was in the interest of judicial efficiency to join these claims. See Jimenez, 513 F.3d at 82. Thus, the District Court properly joined the Land fraud Counts and Riley's Tax Fraud Counts under Federal Rule of Criminal Procedure 8(b).

## 2. Motion For Severance

James argues that the District Court abused its discretion when it denied his motion for severance because the inclusion of the Tax Fraud Counts prejudiced the jury against him.[27] The Federal Rules of Criminal Procedure permits a court to sever counts that have been properly joined under Rule 8(b) "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . ." Fed. R. Crim. P. 14. Severance should only be granted "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Urban, 404 F.3d 754, 775 (3d Cir. 2005) (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)). A defendant must "pinpoint clear and substantial prejudice resulting in an unfair trial." United States v. McGlory, 968 F.2d 309, 340 (3d Cir. 1992) (internal quotation marks and citation omitted). Thus, "[i]t is not enough to show that severance would have increased the defendant's chances of acquittal." Id.

---

[27]It is not entirely clear from James' brief whether he is appealing the District Court's denial of severance. The Court has chosen to address the issue as if James had raised the discretionary issue properly on appeal.

In this case James has not pinpointed any specific instance of substantial prejudice resulting in an unfair trial. Rather, James merely asserts that the jury was unable to compartmentalize the evidence. Juries, however, "are presumed to follow their instructions." Zafiro, 506 U.S. at 540–41 (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)). The District Court specifically instructed the jury that it "must separately consider the evidence against each defendant on each offense charged, and . . . must return a separate verdict for each defendant on each offense." SA 1196:34. These strict instructions are "persuasive evidence that refusals to sever did not prejudice the defendants." Lore, 430 F.3d at 206 (internal quotation marks and citation omitted). Thus, there was no "serious risk" of "compromis[ing] a specific trial right" by keeping the Land Fraud Counts and the Tax Fraud Counts joined. Urban, 404 F.3d at 775 (internal quotation marks and citation omitted). The simple fact that the evidence produced at trial was "not germane to all counts against" James, does not entitle James to a separate trial. United States v. Console, 13 F.3d 641, 655 (3d Cir. 1993); accord McGlory, 968 F.2d at 340 ("[T]he mere introduction of other crimes evidence against one defendant does not entitle a co-defendant to a separate trial.").

In conclusion, Riley's Tax Fraud Counts were properly joined initially with the Land Fraud Counts because the counts were substantially related as the tax fraud arose from Riley's failure to report her income from the land fraud scheme. Additionally, the District Court did not abuse its discretion when it denied James's motion for severance because James did not point to any specific prejudice. Further, any prejudice that might have resulted from the joint trial was easily cured by the District Court's jury instructions.

### D.    Motion for Mistrial

James argues that the District Court abused its discretion

34

when it denied his motion for mistrial.[28]  "We review the denial of a motion for a mistrial based on a witness's allegedly prejudicial comments for an abuse of discretion."  Lore, 430 F.3d at 207 (citing United States v. Xavier, 2 F.3d 1281, 1285 (3d Cir. 1993)).  Three factors must be analyzed to determine whether the defendant was prejudiced: "(1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court."  Lore, 430 F.3d at 207 (citing Xavier, 2 F.3d at 1285).

At issue is the testimonial statement of Basil Franklin, James's Chief of Housing Production for the City of Newark, about a meeting he had with Jackie Mattison ("Mattison"), James's former Chief-of-Staff.  Mattison had been convicted of a criminal offense, United States v. Bradley, 173 F.3d 225 (3d Cir. 1999), and was serving a sentence of work release when he met with Franklin.  The District Court instructed the Government to direct Franklin not to mention that Mattison had been incarcerated or in a work release program, which would imply that Mattison had been previously convicted of a crime.  During the course of the Government's direct examination of Franklin, however, Franklin twice mentioned that Mattison was involved in a work release program.[29]  James immediately

---

[28]We note that although Riley joined the motion for mistrial in sidebar, she does not appear to appeal the denial.

[29]The testimony proceeded as follows:

[Prosecutor]: So what happened when you and Jackie Mattison met in the furniture store
[Witness]:  He told me that he was on a work release program.
[Prosecutor]: I'll move to strike that. What, if anything, did Jackie Mattison tell you about property?
[James's attorney]:  Your honor, may we approach, please?
[The Court]:  In a moment, in a moment.

35

moved for a mistrial.

The District Court denied James's motion for a mistrial, but agreed to give a curative instruction at defense counsel's request. The District Court took a ten minute break to allow counsel to speak with James and decide. After the break, defense counsel chose not to ask for an instruction from the court because he did not want to exacerbate any alleged prejudice. The witnesses's testimony resumed, lasting the rest of the day and into the following two days. At the conclusion of the trial, the District Court instructed the jury that James was not being charged with doing anything unlawful with Mattison, nor was he involved in the conduct that placed Mattison on work release.

Addressing the three-factor test to determine prejudice we look to the nature of the statement first. Franklin's improper remarks consisted of two references to a "work release program" in testimony that spanned three days over the course of a five week trial. Thus the remarks cannot be characterized as either pronounced or persistent, nor were they systematic. See United

---

[Prosecutor]: What, if anything, did Jackie Mattison tell you about property?
[Witness]: He told me that he was in the work release program and participate–
[James's attorney]: Judge, may we approach?
[Prosecutor]: May I Lead, your Honor?
[The Court]: Yeah. Just ask him–just with respect to the property, did he have any conversations with you just as to property?
[Witness]: Yeah. He told me that–that–he said–
[Prosecutor]: Did–
[Witness]: He said that he needed–
[The Court]: All right, just a moment.
[Witness]: –an income.
[The Court]: We'll have a break.

SA 211:104–05.

States v. Morena, 547 F.3d 191, 194 (3d Cir. 2008) (finding prejudicial misconduct because of the prosecutions "systematic injection of evidence of drug use and dealing" by the defendant); Lore, 430 F.3d at 207 (considering one improper remark by a witness over the course of five days of testimony to not be "pronounced and persistent"); Xavier, 2 F.3d at 1285 (finding that five or six angry outbursts by a witness were neither pronounced nor persistent).

Second, there is no question that the jury did not solely rely upon the fact that Mattison was on work release or that Franklin met with Mattison to convict James. The relevance of the evidence was merely to demonstrate James's control over the SWRP properties. There was a significant amount of evidence presented to prove James's control over the properties and the SWRP process. See discussion supra Part I.A.2; see also Morena, 547 F.3d at 196 (finding that the "other evidence" was insufficient to overcome the prejudice and sustain a conviction because it consisted only of "the testimony of one witness who [had] significant credibility issues and a few items of circumstantial evidence"). In this case, the strength of the other evidence is sufficient to outweigh any possible prejudice Franklin's statements may have inflicted on James.

Finally, the third factor addresses whether curative action taken by the lower court mitigates any potential prejudice. In this case the District Court indicated that it was willing to give immediate curative instructions, but James declined the offer to prevent further attention being drawn to Franklin's statements. At the end of the trial, however, the District Court instructed the jury that "[t]here is no charge in this Indictment that the Defendant Sharpe James did anything unlawful, directly or indirectly, with respect to the sale of any Newark property to Jackie Mattison." These instructions are presumed to have cured any potential prejudice from Franklin's improper remarks. See Lore, 430 F.3d at 207 (finding no prejudice, in part, because although the defendant "declined the district court's offer to issue a specific curative instruction at the time of [the witness's] statement, the court subsequently instructed the jury" in a manner which sought to cure any prejudice).

In conclusion, Franklin's comment that Mattison was on work release did not prejudice James because the statements were not "pronounced and persistent," the strength of the other evidence was sufficient to convict James, and the District Court cured any potential prejudice through its instructions to the jury. Consequently, the District Court did not abuse its discretion when it denied James's request for a mistrial.

## E.    Alleged Hearsay Statement

James argues that the District Court erred by admitting a hearsay statement during the course of Franklin's testimony. "We review a district court's decision to admit or exclude evidence for abuse of discretion, although our review is plenary as to the district court's interpretation of the Federal Rules of Evidence." Marra v. Phila. Hous. Auth., 497 F.3d 286, 297 (3d Cir. 2007).

At issue is Franklin's testimony that Alfred Faiella ("Faiella"), the Deputy Mayor and Director of the DEHD, came to his office with Riley and another woman and "smiling and jokingly [said] that the Mayor want[ed Franklin] to help these ladies acquire some property." From this statement Franklin testified that he understood it to mean that "the Mayor want[ed him] to . . . vet her and assist her, if possible, in acquiring property." James objected to Franklin's statement, and argues on appeal that the statement is inadmissible because Faiella was not acting lawfully when he made the comment and thus, was not acting within the scope of his employment.[30]

The District Court allowed Franklin's testimony as a non-hearsay statement admissible under Federal Rule of Evidence

---

[30]James does not argue that his own statement to Faiella was inadmissible. We assume, therefore, that James's statement was properly admitted under Federal Rule of Evidence 801(d)(2)(A), which states that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement, in either an individual or representative capacity."

38

801(d)(2)(D). Rule 801(d)(2)(D) states that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."[31] Fed. R. Evid. 801(d)(2)(D). Thus, this rule requires that when making an admission on behalf of the defendant, the declarant be both authorized and acting within the scope of employment.

Faiella was the Deputy Mayor and Director of the DEHD and thus was authorized to direct Franklin as to who should be considered for SWRP properties. Franklin testified that Faiella had the final say on all property allocations and that "everything went through Alfred Faiella." Franklin also indicated that "from time to time [Faiella] would mention that X, Y, or Z person recommended that we try to . . . to vet a person to do the development." Consequently, as Franklin's supervisor, it was within the scope of Faiella's employment to instruct Franklin of his duties regarding SWRP properties. See Marra, 497 F.3d at 297–98 ("[B]eing a direct decision-maker, of course, constitutes strong proof that a statement was made within the scope of employment[.]" (internal quotation marks and citation omitted)); Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 134 (3d Cir. 1997) (holding that executives who had authority to make personnel decisions were acting within the scope of their employment when they stated their views on the state of the workforce).

Despite James's assertion, a statement of illegal activity can still be within the scope of employment and can be admissible under 801(d)(2)(D). See Cline v. Roadway Express, Inc., 689 F.2d 481, 488 (4th Cir. 1982) (holding that testimony of certain managers' statements indicating that they understood

---

[31]James's brief mentions Federal Rule of Evidence 801(d)(2)(C), while discussing the test of agency. Because this rule is not mentioned anywhere else in James's submissions, and the District Court allowed the statement in under 801(d)(2)(D), the Court assumes that the reference to 801(d)(2)(C) was in error.

the new policy was designed to replace older workers with younger ones, which was an alleged violation of the Age Discrimination in Employment Act, was admissible under Fed. R. Evid. 801(d)(2)(D) as admissions of agents concerning a matter within the scope of their employment).  In sum, the District Court did not err in its interpretation of the Federal Rules of Evidence when it admitted Franklin's testimony of Faiella's statement on the basis that it constituted a non-hearsay utterance of an agent, which is admissible under Federal Rule of Evidence 801(d)(2)(D).

## F.    The Government's Summation Remark

James argues that the United States' inappropriate comment during its rebuttal summation "merely capped an avalanche of unfairness" that warrants reversing the conviction.[32]  Because James did not seek a mistrial in the District Court challenging the Government's closing remark, this court reviews the District Court's decision not to grant a mistrial sua sponte for plain error.  Virgin Islands v. Charleswell, 24 F.3d 571, 576 (3d Cir. 1994).  A plain error occurs when the "prosecutor's comments [are] so serious as to 'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.'" United States v. Pungitore, 910 F.2d 1084, 1126 (3d Cir. 1990).  Thus, we may reverse if the prosecutor's comments deprived James of a fair trial.

There is no per se rule against invitations to a jury to "send a message."  Greenleaf v. Garlock, Inc., 174 F.3d 352, 364 n.9 (3d Cir. 1999).  The type of counsel misconduct that warrants granting a new trial is not generally a single isolated inappropriate comment, but rather repeated conduct that "permeate[s]" the trial.  Blanche Rd. Corp. v. Bensalem Twp.,

---

[32]The prosecutor stated in its rebuttal summation that, "[a]t the end of the day you have a decision to make.  Are you going to turn your head away from this type of corruption, say it's business as usual, what can I do?  Or are you going to make a statement, say it loud and clear, send a message."  SA 1183:193–94.

57 F.3d 253, 264 (3d Cir. 1995), <u>overruled on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington</u>, 316 F.3d 392, 400 (3d Cir. 2003). Although his complaint suggests it occurred, James does not point to specific conduct of a similar nature which allegedly permeates the case. While the Government concedes that the prosecutor's "send a message" comment was improper, there was an immediate and sustained objection that cut off the prosecutor's remarks. Further, the District Court directly addressed the inappropriate nature of the "send a message" comment in its instructions to the jury. The District Court, in its curative jury instruction given the day after the prosecutor's comment, stated that

> you must not think of your verdict as sending a message to anyone. Yesterday you heard me sustain an objection to [the prosecutor's] suggestion in summation that you should "send a message" by your verdict.
> I sustained the objection because this was an improper comment. You must reach your verdict in this case based solely on the evidence, on the facts as you determine them based on the law as I present it to you now, without concern for public opinion or anything else outside of this case. That is what the law requires.

SA 1191:14. This jury instruction clearly addressed the improper comment and thus even if there were some risk of prejudice it was cured because "juries are presumed to follow their instructions." <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987). In sum, the prosecutor's statement did not deprive James of a fair trial, and there was no plain error.

## III. Conclusion

In conclusion, in light of the Supreme Court's recent decision in <u>Skilling</u>, we will reverse the Count 5 convictions as to James and Riley. We will affirm the Counts 1–4 convictions as to James and Riley because there is sufficient evidence from which the jury could have found Appellants guilty beyond a reasonable doubt. Finally, we affirm the District Court's denial of James's post-trial motions and do not find that the District

41

Court erred in any of the challenged determinations. We will remand for the District Court to perform any re-sentencing necessitated by the Count 5 reversal.