**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4335
_____

UNITED STATES OF AMERICA

v.

BRIAN M. CAMPBELL,
                            Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 2-10-cr-00372-001)
District Judge:  Honorable Dickinson R. Debevoise

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 15, 2012
_____

Before:  RENDELL, FUENTES, and CHAGARES, Circuit Judges.

(Filed: December 7, 2012)
_____

OPINION
_____

CHAGARES, Circuit Judge.

    Brian Campbell appeals his conviction for 33 counts of mail fraud under 18 U.S.C.

§ 1341.  He also appeals the forfeiture and restitution orders entered by the District Court.

For the reasons stated below, we will affirm the District Court.

## I.

We write solely for the parties and will therefore recount only those facts that are essential to our disposition. Brian Campbell was the managing director of Pamrapo Service Corporation (the "Service Corporation"), the investment arm of Pamrapo Savings Bank, located in Bayonne, New Jersey. Because the Service Corporation could not sell financial products directly to the public, it offered products through two third-party broker-dealers called Prime Capital Services, Inc. and Asset & Financial Planning, Ltd. Campbell was the Service Corporation's registered representative with both of the broker-dealers.

The Service Corporation earned a commission when its clients used the broker-dealers, and Campbell received a portion of those commissions. In 2006, the Service Corporation's Board of Directors reduced Campbell's commissions such that the commissions would only be paid after the bank's expenses and overhead were deducted.

After Campbell's commissions were reduced, he contacted the broker-dealers in an attempt to persuade them to pay their commission checks directly to him instead of to the Service Corporation. As a part of his plan, he told the broker-dealers that the bank hoped to get out of the investment advisory business entirely. Eventually, the broker-dealers sent a letter to William Campbell (Campbell's father and the bank's president) asking for his signed approval of the new terms that Campbell had requested. Though he later denied knowledge of the agreement, William Campbell apparently signed the letter stating the new terms.

In the summer of 2007, Campbell began to receive checks directly, substantially increasing his commissions. According to testimony at trial, he successfully concealed the fact that he was receiving the commissions directly for about a year. In September of 2008, the bank's CFO Kenneth Walter approached William Campbell with evidence demonstrating the existence of Campbell's scheme. William Campbell expressed shock and demanded that the money be returned to the bank. Eventually, a settlement agreement was reached between Campbell and the bank.

In October of 2010, Campbell was indicted on 33 counts of mail fraud (corresponding to the 33 commission checks he received) pursuant to 18 U.S.C. § 1341, and four counts of money laundering under 18 U.S.C. § 1957(a). The jury convicted Campbell on the 33 mail fraud counts, but deadlocked on the money laundering charges. Based on the convictions, the District Court sentenced Campbell to six months of imprisonment, ordered him to pay $300,758.35 in restitution, and ordered a forfeiture of $571,104.96. Campbell now appeals, claiming that the District Court (1) improperly allowed hearsay evidence; (2) violated his Sixth Amendment rights by limiting cross-examination and documentary evidence that would have assisted his defense; (3) improperly denied his request to have the jury determine the monetary loss suffered by the bank as a result of the scheme; and (4) erred in ordering restitution and forfeiture.

II.[1]

A.

At trial, the Government asked Walter and bank consultant Robert Hughes about the meeting at which William Campbell apparently learned of his son's commission scheme.[2] Defense counsel made numerous objections to the related testimony, which included descriptions of William Campbell's demeanor and recollections of the meeting participants' comments. The District Court overruled the objections. Campbell now argues that the District Court was mistaken on the hearsay question, and also maintains that his Sixth Amendment Confrontation Clause right was violated by introduction of the evidence. We exercise plenary review for Confrontation Clause challenges. United States v. Berrios, 676 F.3d 118, 125 (3d Cir. 2012). We review a district court's decision whether to admit or exclude hearsay evidence for abuse of discretion, but our review of a district court's interpretation of the Federal Rules of Evidence is plenary. United States v. Riley, 621 F.3d 312, 337 (3d Cir. 2010).

1.

As part of his hearsay argument, Campbell asserts that the "statements . . . of William Campbell as recounted by Mr. Walter and Mr. Hughes . . . are testimonial" and their introduction violated the Sixth Amendment's Confrontation Clause. Campbell Br. 18. Though Campbell does not clearly identify the statements at issue, we will assume

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).
[2] The meeting involved William Campbell, Walter, and Hughes, and eventually Campbell was called to join the meeting.

4

his argument encompasses all statements earlier listed in the hearsay portion of his brief. See Campbell Br. 13-14.  The alleged statements in question all took place during the September 2008 meeting in which Walter informed William Campbell that Campbell was receiving commissions directly.  At trial, Walter and Hughes testified that William Campbell said "[t]his is wrong," demanded an explanation from Campbell, instructed Campbell to retrieve the letter agreement that changed the course of the commission payments, and demanded return of the money.  Id.

In Crawford v. Washington, 541 U.S. 36, 59 (2004), the Supreme Court clarified that if a declarant's statements are testimonial in nature, the Sixth Amendment requires an opportunity for confrontation unless the witness is unavailable and there was prior opportunity for cross-examination.  Campbell cites Crawford, but limits his substantive argument to the unsupported assertion that William Campbell's statements "are testimonial and fall squarely within the restrictions of [Crawford]."  Campbell Br. 18.

Campbell's argument fails because there is no indication that William Campbell's statements at the meeting were testimonial.  His statements at the meeting could only be considered testimonial if they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Crawford, 541 U.S. at 52 (quotation marks omitted).  There was no reason for William Campbell to believe that his statements at a meeting would be made available for use at a trial.  See id. (explaining why statements to police interrogator are testimonial); United States v. Hinton, 423 F.3d 355, 359 (3d Cir. 2005) (concluding that

5

surreptitiously recorded comments are not considered testimonial because participants do not believe comments are being heard by authorities).

2.

Campbell also argues that the District Court's decision to allow testimony about William Campbell's demeanor in the meeting violates the Federal Rules of Evidence. The court allowed Walter to testify that when William Campbell heard the news about his son, he was angry and in shock. Campbell acknowledges that nonverbal conduct is only hearsay if it is intended as an assertion, but claims that requirement is met here. He provides a lengthy quotation from the Advisory Committee Notes to Federal Rule of Evidence 801, which in part state that "nonverbal conduct . . . [that] may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved" is "arguably, in effect an assertion of the existence of the condition and hence properly includable within the hearsay concept." Campbell Br. 19.

Contrary to Campbell's assertion, the Rules of Evidence and our case law make clear that testimony concerning a person's nonverbal emotional reaction does not qualify as an assertion. Campbell's quotation from the Advisory Committee Notes is misleading: despite the fact that such nonverbal conduct is "arguably includable within the hearsay concept," the next sentence of the Notes explains that "[a]dmittedly evidence of this character is untested with respect to the perception, memory, and narration (or their equivalents) of the actor, but the Advisory Committee is of the view that these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds." This Court has taken the same view. Kerry Coal Co. v. United

6

Mine Workers of Am., 637 F.2d 957, 967 (3d Cir. 1981) (affirming district court's rejection of hearsay challenge to witness's testimony that his employees were afraid because it constituted first-hand knowledge of employees' physical and mental condition).

3.

Campbell also complains that in several instances, Walter and Hughes were allowed to testify as to what William Campbell said in the meeting.[3] As with his other arguments, Campbell merely provides several excerpts of the testimony of Walter and Hughes and concludes that "it is obvious that these are inadmissible hearsay and their admission alone requires a new trial." Campbell Br. 20.

Campbell cannot succeed because most of the comments he lists were not declarations of fact, and therefore are not capable of being true or false. See, e.g., United States v. Reilly, 33 F.3d 1396, 1410 (3d Cir. 1994) ("Instructions to an individual to do something are . . . not hearsay . . . because they are not declarations of fact and therefore are not capable of being true or false.") (quotation marks omitted). The only remaining statement, William Campbell's declaration that "[t]his is wrong," was allowed by the District Court as an adoptive admission under Fed. R. Evid. 801(d)(2)(B). We will not disturb this conclusion because, regardless of whether the exception applies, any error in admission of this statement was harmless. The inclusion of that alleged statement had no

---

[3] Generally, the statements related to William Campbell's reaction to hearing the information about his son's crime. The witnesses claimed that William Campbell (1) stated "[t]his is wrong"; (2) wanted an explanation from Campbell; (3) asked what agreement Campbell was referring to; (4) ordered Campbell to retrieve the signed agreement; and (5) demanded the money be returned. Campbell Br. 13-14.

7

prejudicial effect on Campbell. The rest of the testimony concerning William Campbell's reaction to learning about his son's scheme clearly indicates that (according to Walter and Hughes) he believed Campbell's conduct was wrong and needed to be rectified. Accordingly, introducing the additional statement "[t]his is wrong" almost certainly did not contribute to the judgment against Campbell. See United States v. Cunningham, 694 F.3d 372, 391-92 (3d Cir. 2012) ("The test for harmless error is whether it is highly probable that the error did not contribute to the judgment.") (quotation marks omitted).

In sum, the District Court did not commit reversible error by admitting testimony concerning William Campbell's statements and demeanor.

## B.

Campbell also asserts that reversal is required because the District Court prevented him from fully demonstrating the extent to which William Campbell controlled the bank. By making this showing, Campbell argues, he could have persuaded the jury that William Campbell had the actual or apparent authority to approve the change to his son's commissions.

One manner in which Campbell sought to achieve his goal was by attempting to demonstrate that his father had caused the bank to violate the Bank Secrecy Act, and that he concealed this violation from the bank's board of directors. Ultimately, Campbell states, the concealment caused the federal Office of Thrift Supervision ("OTS") to require William Campbell's removal from the bank and levy a $5 million fine against the bank. At trial Campbell began to question Walter about the bank's violation of the Act,

8

but the District Court sustained the Government's objection on Rule 403 grounds, concluding that its introduction could confuse the jury. Campbell asked similar questions of the chairman of the board of the bank and the Service Corporation, Daniel Massarelli, but Massarelli denied knowledge of the issue. When Campbell sought to introduce documentary evidence of William Campbell's correspondence with the OTS, the District Court refused because of the documents' lack of probative value and their capacity to distract the jury. Appendix ("App.") 554-55.

We review a district court's Rule 403 decision for abuse of discretion; we will only conclude that a decision based on Rule 403 is an abuse of discretion if it was "arbitrary and irrational." United States v. Lee, 612 F.3d 170, 184-85 (3d Cir. 2010) (quotation marks omitted).

Here, the District Court was not arbitrary and irrational in preventing the defense from delving into William Campbell's correspondence with the OTS and the resulting legal action. While there may have been some probative value to the evidence, it was minimal: its explanation would have done nothing to show William Campbell's actual authority over bank operations, and it would have done little to show his apparent authority. Although the evidence may have demonstrated that William Campbell was willing to conceal his actions from the board of directors, Campbell makes no proffer of evidence showing that he was aware of his father's deceit.[4] More likely, as the District

---

[4] The probative value is also lessened by the fact, as the District Court mentioned, that Campbell had already established that William Campbell was essentially in complete control of the bank. App. 555.

Court held, allowing a diversion into the details of William Campbell's actions on a wholly unrelated issue would have caused confusion and distraction.

In conclusion, the District Court did not abuse its discretion in limiting introduction of evidence regarding William Campbell's correspondence with the OTS and other actions relating to violation of the Bank Secrecy Act.

## C.

Campbell also maintains that the District Court orders awarding restitution and forfeiture were improper, arguing that the "loss amount for the purposes of the advisory federal sentencing guidelines is $0.00."[5]  Campbell Br. 29.

## 1.

The District Court ordered Campbell to pay $300,758.35 in restitution to Bayonne Community Bank, the successor in interest to Pamrapo Savings Bank.  Campbell urges us to reverse the restitution order, arguing that the amount of a restitution order cannot exceed the bank's actual loss, which was zero.  He asserts that the loss was zero because Campbell entered into a settlement agreement with the bank in which he agreed to repay

---

[5] In a related argument, Campbell claims that the jury, not the District Judge, was required to determine the bank's loss amount for purposes of sentencing.  The basis of his argument is not exactly clear, principally because his brief does little more than provide a three-page block quotation from United States v. Leahy, 438 F.3d 328, 335-38 (3d Cir. 2006), which summarizes the Supreme Court's line of cases that culminated with United States v. Booker, 543 U.S. 220 (2005).   As Leahy confirmed, Booker held that "'[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.'" Leahy, 438 F.3d at 336 (quoting Booker, 543 U.S. at 244).  There is no serious contention here that determination of the loss amount did cause or could have caused Campbell's sentence to exceed the statutory maximum punishment for a violation of 18 U.S.C. § 1341.

the amounts owed and paid an additional $300,000 to purchase the bank's investment division. We review the District Court's factual conclusions as to the amount of loss for clear error, such that the appellant must establish that the "restitution figure is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." United States v. Vitillo, 490 F.3d 314, 330 (3d Cir. 2007) (quotation marks omitted). The appropriateness of the restitution figure in general is reviewed for abuse of discretion. Id.

The District Court's calculation of the loss amount was not clearly erroneous. Starting with the original $571,104.96 received by Campbell pursuant to the scheme, the judge reduced the loss amount to $300,758.35 because of payments made to the bank by Campbell and his father. The District Court was justified in refusing to take into account retroactive salary increases for purposes of calculating the loss amount, see App. 931, and concluding that once Campbell attempted to convert the broker-dealers into his personal clients, the amount of commission payments he would have received absent the existence of the scheme should not offset to the bank's loss.

### 2.

The District Court ordered forfeiture of $571,104.86. However, the District Judge stated that he would not have ordered any forfeiture if not for the fact that he believed the statute required it. App. 904-05. Campbell argues that forfeiture was inappropriate because it was not required by statute. We exercise plenary review over a district court's interpretation of a statute. United States v. Soto, 539 F.3d 191, 194 (3d Cir. 2008).

11

Under 18 U.S.C. § 982(a)(2)(A), a court "shall order" a person convicted of an offense in violation of 18 U.S.C. § 1341 to forfeit property received as a result of the violation. See also United States v. McGinty, 610 F.3d 1242, 1246 (10th Cir. 2010). Despite the seemingly clear language of the statute, Campbell argues that this Court held in United States v. Vampire Nation, 451 F.3d 189 (3d Cir. 2006), that criminal forfeitures are permitted in connection with mail fraud crimes, but not required. Though that case did concern mail fraud, it did not apply § 982(a) "[b]ecause no financial institution was involved." Id. at 198-99. Instead, the case "resolve[d] whether 28 U.S.C. § 2461(c) authorizes criminal forfeiture of mail fraud proceeds that are not the result of mail fraud perpetrated against a financial institution." Id. at 199.

Any forfeiture orders made pursuant to 18 U.S.C. § 982 are "governed by the provisions" of 21 U.S.C. § 853. Subsection 853(a)(1) states that property constituting proceeds of the criminal violation are subject to forfeiture, and § 853(p) provides for forfeiture of substitute property if property derived from the crime is for some reason unavailable for forfeiture. Without explanation, Campbell asserts that § 853(a)(1) does not apply, then seems to argue that because § 853(p) is inapplicable here, forfeiture is inappropriate.

We will not reverse the order of forfeiture on these grounds. First, Campbell has provided no reason for us to hold that the $571,104.86 is not "property constituting, or derived from, any proceeds . . . obtained . . . as the result of [the] violation." § 853(a)(1). Second, though some mention of seeking substitute assets was made at the sentencing hearing, App. 891, Campbell has failed to establish that resort to substitute

12

property is necessary, or that a failure to meet the requirements of § 853(p) means that a forfeiture order should be reversed.

Campbell's other contentions concerning the forfeiture order are without merit.

III.

For the foregoing reasons, we will affirm the judgment of the District Court.